# EXHIBIT 2

<u>Translation</u>

**Cortbaoui & Kanaan Law Firm**

**To the attention of the Court of First Instance of Beirut
Chamber dealing with Financial Cases
(Chamber of Judge Zalfa El Hassan)**

<u>**First Response**</u>

<u>**Lawsuit No.: 448/2020**</u>
**Exchange**

<u>**Submitted by:**</u>

<u>**The Defendant:**</u>          **Bank Audi SAL**

Represented by its attorneys at law, the President of the Bar Association Chakib Cortbaoui, Wadih Cortbaoui and Andre Nohra by virtue of a power of attorney, a copy of which is attached hereto (Document No. /1/).

<u>**Against the Plaintiff:**</u>     **Majed bin Ameer Al Attabi**

Represented by his attorneys at law Aref El-Aref, Mohammad Ramadan and Katia Daou.

In response to the statement of claim, the Defendant Bank states the following:

<u>**The Facts:**</u>

1. On 28/06/2015, the Plaintiff signed with the Defendant Bank a contract by virtue of which accounts were opened for him with the said Bank. The mentioned contract, entitled "*General contract for opening and operating accounts and general terms and conditions related to e-banking services*" included inter alia the following:

*"Chapter Six" Second: Liability:*

*(...)*

*2- Limitations of the Bank's Liability*

*A- The Bank shall not be liable for direct or indirect damages incurred by the Customer, the Cardholder, the Secondary User or any third person as a result of force majeure, security events, or any other cause that is beyond the Bank's will or control (...).*

1

*B- The Bank shall not be liable if the foreign currency becomes totally or partially unavailable for any reason whatsoever, particularly further to decisions issued by the competent legislative or administrative authorities or for any other reason (...).*

(Attached a copy of the contract - **Document No. /2/)**.

2.  In light of the above, the Plaintiff deposited an amount of money with the Defendant Bank, and he never made any external transfer, noting that he was still depositing money in his accounts with the Defendant by means of internal transfers or cheques deposits, out of which for example a transfer of USD /300,000/ to his account on 18/09/2020 and a cheque deposit operation of USD /100,000/ on 10/11/2020. Therefore, this indicates that the Plaintiff has recently deposited money in his accounts with the Defendant Bank, despite his full knowledge of the banking restrictions imposed by the exceptional circumstances since the 17th of October2019, which certainly constitute force majeure.

3.  The Defendant proposed to the Plaintiff to restitute to him the sum due to him by means of a banking cheque drawn on the Banque du Liban. However, the Plaintiff refused this matter, as if he was oblivious of the exceptional circumstances that the country is going through.

\*\*\*

**The Law:**

**First:**          **The lawsuit must be dismissed in form for the non-payment of the proportional fee**

In the present case, the Plaintiff requests the payment of the value of the amount that he had deposited with the Defendant. He requests that this payment be made through an external transfer.

Therefore, the lawsuit is subject to the proportional fee in accordance with the Law on Judicial Fees. Consequently, the Plaintiff is required to pay the due proportional fee, within a specified time limit at the risk of having his lawsuit dismissed.

2

In any case, the lawsuit must be dismissed in form if it is found to be in violation of any of the legally specified formal conditions.

**Second:**     **The lawsuit must be dismissed on the merits for illegality.**

I.   The Plaintiff bases his claim on Articles /307/ of the Code of Commerce and /701/ of the Code of Obligations and Contracts, as well as on two agreements signed between the Lebanese State and the Kingdom of Saudi Arabia.

This legal basis on which the Plaintiff builds his lawsuit is totally invalid.

Indeed:

1. **Regarding the Plaintiff's claims with respect to Article /307/ Code of Commerce:** The Defendant does not refuse to return the deposit (which has been converted into a debt). We have already stated that the Defendant proposed to the Plaintiff a banking cheque drawn on the Banque du Liban for the value of the debt, but the latter refused this offer.

2. **Regarding Article /701/ of the Code of Obligations and Contracts:** This Article states the following:
   *The depository may not compel the depositor to retrieve his deposit before the agreed-upon term, except for a legitimate reason, **rather, the depository must return the deposit at the depositor's request even if the date set for its return has not yet come.***

   As previously stated, the Defendant did not refuse to return the deposit, and therefore, the said Article cannot be applied to the present dispute.

3. **We would like to recall that Articles /302/, /704/, and /764/ of the Code of Obligations and Contracts provide for the return of the loan in the place where it was contracted, i.e. in Lebanon.**

3

4. **As for the two agreements invoked by the Plaintiff**, they do not apply to the present lawsuit, since they are signed between the Lebanese Republic and the Kingdom of Saudi Arabia, and it is up to each of these two States exclusively - **being persons of public law** - to demand to the other State the implementation of the provisions of the two agreements, and this does not apply to individuals.

In other words, only the Kingdom of Saudi Arabia - the country of which the Plaintiff is a national - has the right to demand the implementation of the provisions of the said agreements, in the event of any breach thereof.
Subsequently,
The Plaintiff has no capacity to invoke the two agreements concluded between the Lebanese State and the Kingdom of Saudi Arabia, and consequently, this claim must not be accepted and must be dismissed in form.

In the alternative, if we consider that the Plaintiff has the capacity to invoke the provisions of the two said agreements, it is necessary to consider the following main points:

- The agreement concluded between the Republic of Lebanon and the Kingdom of Saudi Arabia and ratified by Law No. 43 dated 03/06/1967 has become expired as it was signed for a period of only one year as stipulated in Article /13/ thereof; In any case, it was later replaced by the agreement signed on 11/11/1971 that is mentioned hereinbelow;

- The agreement signed on 11/11/1971 between the Republic of Lebanon and the Kingdom of Saudi Arabia and ratified by Law No. 67 dated 20/12/1971 was later amended by Law 520/2003, to become automatically renewable unless one of the parties notifies the other of its desire to terminate it.

We do not know if this agreement is still valid or if it has expired, and the Plaintiff must provide for the relevant evidence since he relies on it.

4

In any case, this agreement does not apply to the present case, with our reservations as to its validity or expiry. This agreement has nothing to do with money and bank deposits. Article /13/ thereof on which the Plaintiff relies, relates to the capitals invested in one of the two countries in economic, commercial and industrial development projects, as set out by Articles /10/ and /14/ thereof. The conclusive evidence of the correctness of our point is Article /5/ of the agreement, which defines its subject, as well as the annexes of the agreement, which specify in detail the agricultural and industrial products and the goods that it covers, and which do not relate at all to bank deposits, neither closely nor from afar. Here, we ask the Plaintiff: Does his deposit of money with the Defendant Bank and the reaping of profits through the interests, constitute an investment activity aimed at developing the economy? We wish that the Plaintiff refers to the most basic principles that govern investments and to the purpose of the two aforementioned agreements, and he will certainly find that his claims are misplaced...

5. **In any case,**

This agreement has lapsed and become invalid for several reasons.

Indeed:

In public international law, an international agreement or treaty lapses for several reasons, which are the following:

- The explicit agreement.
- The tacit agreement.
- The circumstances resulting from the behavior of its two parties.
- For reasons that are beyond the control of the two parties (force majeure and change of circumstances).

(Daillier and Pellet – International Public Law, LGDJ, No. 196 and seq.).

In the present case, some of these reasons are available par excellence.

5

**With respect to the reasons resulting from the behavior of one or both parties:**

The 1971 agreement provides in its Articles/10/, /11/, /12/ and /14/for the encouragement of trade exchange between the two countries and the facilitation of the transactions, the encouragement of the nationals of each country to perform pilgrimage, tourism, spend summer and winter in the country of the other party. It also provides for the formation of a joint committee of representatives of the two contracting parties that would meet every six months or at the request of one of the two parties, and which task would be to address difficulties and make proposals...etc.

None of what the agreement stipulated has been implemented since its ratification, which proves the existence of a certain intention not to implement it and thus to cancel it.

Even more, and we say it to describe the reality and not for any other reason, not only the Kingdom did not implement the agreement, but it has asked also its citizens not to invest in Lebanon, not to visit Lebanon for tourism, and not to spend summer and winter in it. Everyone knows that for nearly ten years, Saudi Arabia has been preventing its citizens from coming to Lebanon except for very exceptional reasons, despite the fact that the officials in Lebanon and the popular majority in Lebanon desire having good relations with the Kingdom, flock to it, work and invest in it.

See in this regard:

**P. Daillier and A. Pellet, Public International Law, LGDJ, No. 203:**

*"It consists of the violation of the provisions of the treaty by one party or more. In the internal order, the judge admits that one party may not demand from the other the performance of a contract which it does not respect itself. This attitude is in accordance with the general principle inadimplenti non est adimplendum which is also applicable in the international order."*

**With respect to the change of circumstances:**

The aforementioned reference No. 206-207 stated the following:

*"Non-faulty non-performance - It is the consequence of the occurrence of a situation that is beyond the control of the parties and that makes the performance impossible. Apparently, this circumstance evokes the case of force majeure.*

*No one contests that a change of circumstances from those existing at the time of the conclusion of a treaty may result in its lapsing or suspension. This solution, which is recognized by the jurisprudence and accepted in practice is established in Article 62 of the Vienna Convention."*

The change of circumstances in Lebanon between the date of the agreement in 1971 and what is currently happening in Lebanon cannot be denied. In 1971, prosperity was prevailing in Lebanon, the economy was strong, and the banking sector was at its best. Today, everything has radically changed: The economy and the financial conditions are at their worst, the banking sector is paralyzed and is trying to persevere, and the health situation has wrecked the remaining components of economy, trade and industry, not to mention the political circumstances that we do not need to dwell on.

Thus, the change of circumstances, which constitutes force majeure, as will be discussed later, makes the agreement inapplicable.

This is on the one hand;

On the other hand,

A foreigner cannot have more rights than a Lebanese citizen, particularly pursuant to the objective of equality before public burdens:

See for example:

**The major judgments of administrative case law(Les grands arrêts de la jurisprudence administrative) 12th edition-P.618:**

> *"The Council of State followed its commissioner in all respects.*
> *A- The judgment first establishes the entirely new principle that the responsibility of the State is likely to be engaged, on the basis of the equality of citizens in terms of public burdens, to ensure the distribution of damages resulting from agreements concluded between France and other States and regularly incorporated into the internal legal order."*

7

Since the Lebanese citizens cannot currently make external transfers, likewise the foreigner cannot be entitled to make transfers, or else the foreigners would have been given rights that the Lebanese do not enjoy.

**With respect to force majeure:**

There is no doubt that what has happened and is still happening in Lebanon since 17/10/2019 until today constitutes force majeure, and we will address this issue elsewhere in this Response.

### II.   With respect to the transfer itself;

It was mentioned in the statement of claim that the banking services provided to the clients are numerous and various in line with the variety of banking techniques, including external transfers, and the transfer to the Plaintiff is considered the most important means of performance granted to him and is not burdensome since he is not residing in Lebanon. This claim is legally invalid.

Transfer, according to all jurisprudence opinions and to case law, is a banking service that it is up to the bank to perform or not to perform, if it was not obligatory for the bank pursuant to the contract between the bank and its customer.

See in this sense:

**Decision of the Special Banking Court - Second Panel - No. 247/77 dated 18/10/1994 published in Sader Between Legislation and Case Law - Banks - page 561, which reads as follows:**

> *"Whereas the bank transfer is a <u>consensual operation that takes place once its three parties agree thereon</u>, because what is relied upon is the possibility of performing the transfer, which can actually only take place and produce its effects when the amounts are actually transferred."*

And also:

**Decision of the Civil Court of Appeal of Beirut No. 22 dated 11/01/1996 published in the Journal of Justice (Al Adl) of 1996 - page 45, where it stated as follows:**



8

> *"Whereas, it is agreed upon in jurisprudence and case law, that the transfer operation that requires relying on two banks for completion, is considered completed for the other party <u>when such party's bank approves the transfer order</u>, whereby the transferred amount is debited from his account."*

And also:

**Fadi Nammour, Banking Law. Regulations. Accounts. Operations. Services, 2003 edition, p.571:**

> *"The transfer order is an instruction given by the customer to his bank to debit from his account a specific amount and to credit another account with the same amount. <u>**However, the ordering customer cannot validly claim his right to the transfer until after the bank has accepted the order thus given**</u> (Beirut, 11 January 1996, Al Adl 1996, p.45) this contract is governed by mutual consent."*

Saying that the transfer is a performance of the banking contract, or that it has become a formal legal act, is an addition to the law, an amendment thereto, and a misinterpretation of its provisions.

It is absolutely not true that the external transfer has become an established custom with banks, because transfer was only adopted in the merchants' transactions of importing goods from abroad, or for specific and exceptional purposes such as hospitalization or academic specialization.

As for the general public and the depositors, they do not need transfer and this issue did not interest or concern them. We derive the evidence from this lawsuit itself, as the Plaintiff has never transferred any amount abroad.

But we go further;

Doing business nowadays, in Lebanon or abroad, is carried out via bank credit cards: has this service become mandatory for banks as well? Meaning that the bank is obligated to give a card to anyone who requests it.

9

We add:

There is no provision in the Lebanese law that compels the bank to pay any debt or return any deposit through an external transfer. Rather, the law is clear in saying that the two legally recognized methods of payment are either the payment in kind (Article /249/ COC) or payment by cheque (Article /317/ COC), **at the absolute discretion of the debtor.**

The French legislator as well as the European legislator drew up clear and explicit legislative texts covering the several payment instruments, among which they mentioned the transfer, in addition to several other electronic instruments imposed by technological development:

**Commercial Law Directory (Répertoire de droit commercial) Dalloz Enc., Transfer, by Régine Bonhomme, October 2018, No. 48:**
*"The transfer is part of what the European legislation calls payment instruments, an instrument that does not necessarily use any material medium (such as a paper slip or a plastic card) (...).*

*The role of the bankers in this conception has a material and purely technical aspect: they perform the book entries which carry out the transfer of funds."*

In French law, Article L-311-3 of the Monetary and Financial Code states:
*"Are considered as means of payment all the instruments, which allow any person to transfer funds, whatever the medium or the technical process."*

As for Lebanon, there is no provision, neither in the Code of Obligations, nor in the Code of Commerce, nor in the Code of Money and Credit, that indicates that transfer is a means of payment similar to Articles /249/ and /317/ of the Code of Obligations and Contracts. There is no comprehensive provision similar to the French text. Rather, the law specified only two obligatory means of payment, namely the cash payment and the payment by cheque, at the absolute discretion of the debtor.



10

We would like to recall once again the provisions of Articles /302/, /704/ and /764/ of the Code of Obligations and Contracts, which provide for the return of the loan in the place where it was contracted, i.e. in Lebanon.

**III.**   **In the alternative, the lawsuit must be dismissed on the ground that the Defendant is willing to pay the amount by means of a banking cheque:**

In any case, in the alternative, it remains that the lawsuit must be dismissed because the Defendant is willing to pay the Plaintiff's amount by means of a banking cheque drawn on the Banque du Liban, which is a legal payment instrument par excellence and the most widely used in Lebanon.

We do not believe that we need to cite many case law examples in this regard, and we will suffice with the following:

**Decision of the judge of urgent matters in Beirut, dated 22 January 2020, unpublished:**

> *"Whereas, the Lebanese legislator, in order to guarantee to the cheque its function as a payment instrument, has dedicated several guarantees to the cheque that make it a sure payment instrument that replaces money in payment, especially when determining the terms related to provision, endorsement, payment guarantee, exchange return, joint liability and the passage of short time. However, the legislator has not only established the rules of payment in relation to the cheque, but also added to it an additional guarantee, which is the guarantee of punishment in the event of issuing a cheque without provision."*

Also: The **Plenary Assembly of the Court of Cassation - Decision dated 10/10/1974 –Al Adl 1975 - p. 193.**

**The Plaintiff must be reminded that he was making deposits into his account with the Defendant Bank through internal transfers and cheques, as we have indicted above, so why is he entitled to do so and the other party to the contract (i.e., the Defendant Bank) is not entitled to pay by cheque.**

Therefore, the lawsuit must be dismissed.

**IV.**  **More alternatively, regarding the need to dismiss the lawsuit due to force majeure:**

In the further alternative, it remains that what has been happening in Lebanon since the 17th of October 2019 until now, as a result of the unprecedented economic collapse as well as a result of the Corona pandemic, constitutes force majeure in the very sense of the word. The Lebanese legislator has specifically acknowledged the existence of force majeure since 17/10/2019, when he explicitly stated, in the rationale for the Law on the Suspension of Legal, Judicial and Contractual Deadlines No. 160/2020, that what Lebanon has witnessed since the 17th of October 2019 in terms of exceptional events is characterized by its serious circumstances and grounds, "*which prevented **by force majeure** emanating therefrom the State and the citizens from exercising their rights (...)*"

This matter in itself constitutes an acknowledgment of the existence of force majeure, which the jurisprudence defines as: "*the sudden event characterized by unpredictability and the inability to resist or surpass it*" (**Judge Mustafa Al-Auji, Civil Code, Volume One, Contract, p. 685 and seq.**).

Here we ask: Was the economic collapse expected to occur in this way? Were not the officials in the State, primarily the Governor of the Banque du Liban, reassuring the Lebanese that the exchange rate of the Lebanese pound was stable and that their money with the banks was safe?

Was it possible to predict the Corona pandemic, which wiped out the remaining components of the local economy and even the global economy?

**These unforeseen matters overlap with the contractual terms contained in the contract that is binding to both parties and which we have mentioned in the beginning of the present Response.**

Consequently,

Under force majeure, the Defendant Bank is exempted from performing any service that it could have previously performed (assuming that the service was required - which we deny).

12

See in this sense:

**Judge Mustafa Al-Auji, op. cit.:**

> *"In general, the impossibility of performance results from an unexpected event that is beyond the control of the individual and hence prevents him from performing his obligation, such as a waged war, a revolution that breaks out, or a fire that breaks out in his warehouse and destroys the goods that he pledged to deliver to the buyer. This event is considered a force majeure event or an unexpected event characterized by unpredictability and the inability to resist or surpass it, and one of its consequences would be the exemption of the debtor from his obligations (...).*

Subsequently,

The Defendant Bank is not obligated to carry out the external transfer service in light of the force majeure that led to the non-availability of banknotes in US dollars.

Therefore, the lawsuit must be dismissed in full.

**I.    Fully alternatively, the lawsuit must be dismissed on the merits:**

Fully alternatively, the Plaintiff's claims and demands must be dismissed on the merits, particularly on the following grounds:

- Since the Defendant is not liable for the lack of foreign currency pursuant to the contract signed between the Plaintiff and the Defendant.
- Since the Plaintiff deposited the majority of his money in the account by cheques and transfers.
- Since the Defendant Bank abides by the circulars and decisions of the Banque du Liban, particularly Circular No. 154, which compels the banks to incite the customers who have transferred amounts abroad since 2017, to return part of them to Lebanon, which means that the banks are not currently entitled to make any external financial transfers.

13

- Since enabling the Plaintiff to transfer the required amount abroad constitutes a violation of the objective of equality with other depositors, which constitutes a breach of the objective of equality and this is not permissible.

<div align="center">

**For all these reasons**

**For our future submissions**

**Or for the reasons deemed appropriate by your honorable Court**

</div>

The Defendant Bank asks your honorable Court to dismiss the content of the statement of claim, and consequently to rule as follows:

**First:** To dismiss the lawsuit inform in the event of non-payment of the due proportional fee, or else to dismiss it in form if it is found to be in violation of any of the legally specified formal conditions.

**Second:** In the alternative, to dismiss it on the grounds of invalidity and illegality, or else because the Defendant is willing to pay the amount by means of a banking cheque drawn on the Banque du Liban, otherwise to dismiss the lawsuit on the grounds of force majeure.

**Third:** Fully alternatively, to dismiss the lawsuit on the merits on the grounds of illegality and invalidity, and to dismiss the coercive fine request.

**Fourth:** To condemn the Plaintiff to pay all expenses, attorney's fees, and the judges' mutual fund fee.

**On 22/04/2021**

**Under all reservations,**

**Respectfully yours,**

**By power of attorney**

**Lawyer Chakib Cortbaoui**

14



# قرطباوي و كنعان

مـكـتـب مـحـامـاة

جانب المحكمة الابتدائية المدنية في بيروت المحترمة
– الناظرة في القضايا المالية –
(غرفة الرئيسة زلفا الحسن)

## لائحة جوابية أولى

<u>رقم الدعوى:</u> ٢٠٢٠/٤٤٨
تبادُل

<u>مقدّمة من:</u>
<u>المدّعى عليه:</u>  بنك عوده ش.م.ل.

وكلاؤه المحامون النقيب شكيب قرطباوي وووديع قرطباوي وأندره نهرا
بموجب وكالة مرفقة نسخة عنها ربطاً (<u>مستند رقم /١/</u>).

<u>ضد المدّعي:</u>   ماجد بن أمير العتابي

بوكالة الأساتذة عارف العارف ومحمد رمضان وكاتيا ضو.

\*     \*     \*

ردّاً على إستحضار الدعوى، يُدلي المصرف المدّعى عليه بما يلي:

## في الوقائع:

١– بتاريخ ٢٠١٥/٦/٢٨، وقّع المدّعي مع المصرف المدّعى عليه عقداً تمّ بموجبه فتح حسابات له لدى
المصرف المذكور. وقد تضمّن العقد المذكور، المُعنوَن "عقد عام لفتح وتحريك الحسابات وشروط
وأحكام عامة متعلّقة بالخدمات المصرفية الالكترونية" سلسلة أمور، من ضمنها ما يلي:

" *الفصل السادس "ثانياً: المسؤولية:*
*(...)*
٢– حدود مسؤولية المصرف
أ– لا يكون المصرف مسؤولاً عن الأضرار المباشرة أو غير المباشرة التي تلحق بالعميل
وبحامل البطاقة أو المستخدم الثانوي أو أي شخص ثالث نتيجة قوة قاهرة أو أحداث
أمنية أو أي سبب آخر خارج عن إرادة المصرف أو سيطرته (...).*

ج- *لا يكون المصرف مسؤولاً إذا أصبحت العملة الأجنبية غير متوافرة كلياً أو جزئياً، لأي*
*سبب كان، وبالأخص من جرّاء مقرّرات السلطات التشريعية أو الإدارية المختصّة أو*
*أي سبب آخر (...).*

(ربطاً نسخة عن العقد – **مستند رقم /٢/**).

٢- في ضوء ما هو مذكورٌ أعلاه، قام المدَّعي بإيداع مبلغ من المال لدى المصرف المدَّعى عليه، وهو
لم يقم أبداً بأي عملية تحويل إلى الخارج، علماً أنه كان لا يزال يغذّي حساباته لدى المدَّعى عليه
بواسطة تحاويل داخلية أو إيداعات بواسطة شيكات، منها مثلاً عملية تحويل إلى حسابه بقيمة
/٣٠٠.٠٠٠/ دولار أميركي في ٢٠٢٠/٩/١٨ وعملية إيداع شيك بقيمة /١٠٠.٠٠٠/ دولار أميركي
بتاريخ ٢٠٢٠/١١/١٠. إنّ هذا الأمر يدلّ إذاً على انّ المدَّعي غذّى حساباته لدى المصرف المدَّعى
عليه في الآونة الأخيرة، بالرغم من علمه التام بالقيود المصرفية التي فرضتها الظروف الاستثنائية
منذ ١٧ تشرين الأول ٢٠١٩ والتي تشكّل حتماً قوة قاهرة.

٣- عرض المدَّعى عليه على المدَّعي تسليمه المبلغ الذي يترتّب له، وذلك بواسطة شيك مصرفي
مسحوب على مصرف لبنان، إلاّ أنّ المدَّعي رفض هذا الأمر، وكأنه لا يعلم بالظروف الإستثنائية
التي تمرّ بها البلاد.

\*     \*     \*

## **في القانون:**

### **أولاً: في وجوب رد الدعوى شكلاً لعدم تسديد الرسم النسبي**

إنّ المدَّعي يطلب في الدعوى الحاضرة تسديد قيمة المبلغ المودع منه لدى المدَّعى عليه، وهو يطلب أن
يتمّ هذا التسديد عبر التحويل الى الخارج،

فتكون الدعوى خاضعة للرسم النسبي عملاً بقانون الرسوم القضائية، ويقتضي بالتالي تكليف المدَّعي
بتسديد الرسم النسبي المترتّب عليه، وذلك خلال فترة محدّدة، تحت طائلة رد دعواه.

وبأي حال، يقتضي ردّ الدعوى شكلاً في حال تبيّن أنّها مخالفة لأي من الشروط الشكلية المحدّدة قانوناً.

### **ثانياً: في وجوب رد الدعوى أساساً لعدم قانونيتها.**

‌أ- يرتكز المدَّعي في دعواه على المادتين /٣٠٧/ من قانون التجارة و/٧٠١/ من قانون الموجبات والعقود،
وكذلك على اتفاقيتين موقَّعتين بين الدولة اللبنانية والمملكة العربية السعودية.

وهذا الأساس القانوني الذي يبني عليه المدَّعي دعواه هو غير صحيح على الإطلاق.

وبالفعل:

١– بالنسبة لإدلاءات المدَّعي بخصوص المادة /٣٠٧/ تجارة: إنَّ المدَّعى عليه لا يرفض إعادة الوديعة (التي تحوّلت الى دين). وقد سبق وبيّنا بأن المدَّعى عليه عرض على المدَّعي شيكاً مصرفياً مسحوباً على مصرف لبنان بقيمة الدين، إلاّ أنه رفض هذا العرض.

٢– بالنسبة للمادة /٧٠١/ من قانون الموجبات والعقود: تنص هذه المادة على ما يلي:

"لا يجوز للوديع ان يجبر المودع على استرداد وديعته قبل الاجل المتفق عليه الا لسبب مشروع وإنما يجب عليه ان يرد الوديعة حينما يطلبها المودع وإن يكن الموعد المضروب لردها لم يحل بعد".

إنَّ المدَّعى عليه لم يرفض رد الوديعة كما سبق القول، فلا مجال لتطبيق المادة المذكورة على النزاع الحاضر.

٣– ونذكر بأنَّ المواد /٣٠٢/ و/٤٠٤/ و/٧٦٤/ موجبات وعقود تنصّ على إعادة القرض في المكان الذي عقد فيه، أي في لبنان.

٤– أمّا بالنسبة للإتفاقيتين اللتين يتذرّع بهما المدَّعي، فهما لا تنطبقان على الدعوى الحاضرة، كونهما موقّعتين بين الجمهورية اللبنانية والمملكة العربية السعودية، ويعود لكل من هاتين الدولتين حصراً – كونهما من أشخاص القانون العام– مطالبة الدولة الأخرى بتنفيذ أحكام الإتفاقيتين، ولا ينسحب ذلك على الأفراد.

بعبارة أخرى، يعود للمملكة العربية السعودية وحدها – وهي البلد الذي ينتمي إليه المدَّعي – حق المطالبة بتطبيق أحكام الإتفاقيتين المذكورتين، في حال وجود مخالفة لهما.

بالتالي،

تكون صفة المدَّعي للادلاء بالإتفاقيتين الموقَّعتين بين الدولة اللبنانية والمملكة العربية السعودية منتفية، ما يستوجب عدم قبول هذا الإدلاء وردَّه شكلاً.

وعلى سبيل الاستطراد، وفي حال اعتبرنا أنّ المدَّعي يتمتّع بالصفة للادلاء بأحكام الإتفاقيتين المذكورتين، فلا بدّ من التوقّف عند النقاط الأساسية التالية:

–  إنَّ الاتفاقية المعقودة بين الجمهورية لبنان والمملكة العربية السعودية والمصدّقة بالقانون رقم ٤٣ تاريخ ١٩٦٧/٦/٣، قد انتهت مفاعيلها كونها وُقّعت لمدّة سنة فقط على ما نصت المادة /١٣/

منها؛ وبأي حال، فقد استُعيض عنها لاحقاً بالاتفاقية الموقعة في ١٩٧١/١١/١١ والمذكورة أدناه؛

– إنَّ الاتفاقية الموقعة في ١٩٧١/١١/١١ بين الجمهورية لبنان والمملكة العربية السعودية والمصدقة بالقانون رقم ٦٧ تاريخ ١٩٧١/١٢/٢٠، قد عُدّلت في ما بعد بموجب القانون ٥٢٠/٢٠٠٣، بحيث أصبحت تُجدّد تلقائياً ما لم يبلغْ أحد الطرفين رغبته للآخر في انهائها.

ولا ندري اذا كانت هذه الاتفاقية لا تزال سارية المفعول أو أنها انتهت، وعلى المدّعي تقديم الإثبات على ذلك طالما أنه هو الذي يرتكز عليها.

وبأي حال، فإنَّ هذه الإتّفاقية لا تُطبق على الدعوى الحاضرة، مع تحفظنا لجهة سريانها أو انتهاءها. فهذه الاتفاقية لا علاقة لها بالأموال والودائع المصرفية. **فالمادة /١٣/ منها، التي يرتكز عليها المدَّعي، تتعلق برؤوس الأموال الموظَّفة في أحد البلدين في مشاريع تنمية اقتصادية وتجارية وصناعية على ما توضحه المادتان /١٠/ و/١٤/ منها.** والدليل القاطع على صحة ما نقول هو المادة الخامسة من الاتفاقية التي تحدّد موضوعها، كما وملاحق الاتفاقية، التي تحدّد بالتفصيل المنُتجات الزراعية والصناعية والبضائع التي تشملها، وهي لا تتعلّق أبداً بالودائع المصرفية لا من قريب ولا من بعيد. وهنا نسأل المدّعي: هل يُعتبر إيداعه أموالاً لدى المصرف المدّعى عليه، وجني الأرباح عن طريق الفوائد، عملاً إستثمارياً يهدف إلى تطوير الاقتصاد؟ نتمنّى على المدّعي العودة إلى أبسط المبادئ التي ترعى الإستثمارات والغاية من الإتفاقتين المذكورتين، وهو بالتأكيد سيجد أنَّ إدلاءاته هي في غير محلّها...

٥– **وفي جميع الأحوال،**

إن هذه الاتفاقية باتت ساقطة وغير معمول بها لأسباب عديدة.

وبالفعل:

في القانون الدُّولي العام، تسقط الاتفاقية أو المعاهدة الدولية لعدة أسباب، وهي التالية:

– **الاتفاق الصريح.**

– **الاتفاق الضمني.**

– **الظروف الناتجة عن تصرف فريقيها.**

– **لأسباب خارجة عن إرادة الفريقين (القوة القاهرة وتبدّل الظروف).**

(Daillier et Pellet- Droit International Public, LGDJ, Numéro 196 et s).

وفي القضية الحاضرة، إنَّ بعض هذه الأسباب متوفّر بامتياز.

<u>فبالنسبة للأسباب الناتجة عن تصرّف الفريقين أو أحدهما:</u>

إنّ اتفاقية ١٩٧١ تنص في موادها /١٠/ و/١١/ و/١٢/ و/١٤/ على تشجيع التبادل التجاري بين البلدين وتسهيل المعاملات، وعلى تشجيع رعايا كل بلد على الحج والسياحة والاصطياف والإشتاء في بلد الطرف الآخر، كما وتأليف لجنة مشتركة من ممثّلين للطرفين المتعاقدين تجتمع كل ستة أشهر أو بناءً على طلب احد الفريقين تكون مهمتها معالجة الصعوبات وتقديم الاقتراحات ... الخ.

وكل ما نصت عليه الاتفاقية لم ينفّذ منذ التصديق عليها، ما يثبت وجود نية أكيدة لعدم تطبيقها وبالتالي إلغائها.

بل وأكثر من ذلك، ونقولها لتوصيف الواقع وليس لأي سببٍ آخر، إنّ المملكة لم تنفّذ الاتفاقية فحسب، بل طلبت من مواطنيها عدم الاستثمار في لبنان، وعدم السياحة والاصطياف والإشتاء فيه. وكل الناس تعرف أنه ومنذ ما يقارب العشر سنوات، والسعودية تمنع رعاياها من المجيء إلى لبنان إلاّ لأسباب جدّاً استثنائية، بالرغم من كون لبنان الرسمي والأكثرية الشعبية فيه يرغبون في علاقاتٍ جيدة معها، ويتوافدون اليها، ويعملون ويستثمرون فيها.

يُراجع بهذا الخصوص:

**P. Daillier et A. Pellet, Droit International Public, LGDJ, numéro 203 :**

*« Elle consiste en la violation des dispositions du traité par une ou plusieurs parties. Dans l'ordre interne, le juge admet qu'une partie ne peut exiger de l'autre l'exécution d'un contrat qu'elle ne respecte pas elle-même. Cette attitude est conforme au principe général inadimplenti non est adimplendum qui s'applique aussi dans l'ordre international ».*

<u>وبالنسبة لتبدّل الظروف:</u>

جاء في المرجع عينه المذكور آنفاً رقم ٢٠٦ – ٢٠٧ ما يلي:

*« Inexécution non fautive – Elle est la conséquence de la survenance d'une situation indépendante de la volonté des parties et rendant l'exécution impossible. Apparemment, cette circonstance évoque le cas de force majeure.*

*Nul ne conteste qu'un changement de circonstances par rapport à celles existant au moment de la conclusion d'un traité peut entraîner son extinction ou sa suspension. Cette solution admise par la doctrine et reçue dans la pratique est consacrée par l'article 62 de la Convention de Vienne. »*

ولا يمكن إنكار تبدّل الظروف في لبنان بين تاريخ الاتفاقية في سنة ١٩٧١ وبين ما يحصل حالياً في لبنان. ففي سنة ١٩٧١، كان الإزدهار يعم لبنان، والاقتصاد قوي، والقطاع المصرفي في احسن

حالاته. أمّا اليوم، فكل شيء تبدّل جذرياً: فالاقتصاد والأوضاع المالية في اسوأ حالاتها، والقطاع المصرفي مشلولٌ ويحاول أن يستمر، والحالة الصحية قضت على ما تبقّى من مقوّمات الاقتصاد والتجارة والصناعة، ناهيك عن الظروف السياسية التي لا لزوم للتركيز عليها.

وهكذا، فإنّ تبدّل الظروف، والذي يشكّل قوة قاهرة كما سيأتي بحثه لاحقاً، يجعل الاتفاقية غير قابلة للتطبيق.

هذا من جهة؛

ومن جهةٍ ثانية،

لا يُمكن ان يكون للأجنبي حقوقاً أكثر من حقوق المواطن اللبناني، عملاً لا سيّما بمبدأ المساواة أمام الأعباء العامة:

يُراجع على سبيل المثال:

**Les grands arrêts de la jurisprudence administrative 12eme édition-P. 618 :**

*« Le Conseil d'État a suivi en tous points son commissaire.*

> *A- L'arrêt pose d'abord le principe, entièrement nouveau, que la responsabilité de l'État est susceptible d'être engagée, sur le fondement de l'égalité des citoyens devant les charges publiques, pour assurer la répartition des préjudices nés de conventions conclues par la France avec d'autres États et incorporées régulièrement dans l'ordre juridique interne. »*

**وطالما أنّه لا يُمكن للّبنانيين حالياً إجراء التحاويل الى الخارج، فلا يمكن أن يكون للأجنبي حق التحويل أيضاً، وإلاّ أُعطي الأجانب حقوقاً لا يتمتّع بها اللبنانيون.**

**بالنسبة للقوة القاهرة:**

مما لا شك فيه ان ما حصل ولا يزال يحصل في لبنان منذ ١٧/١٠/٢٠١٩ وحتى اليوم، يشكل قوة قاهرة، وسنتناول هذا الموضوع في مكانٍ آخر من هذه اللاحقة.

**II– أمّا بالنسبة للتحويل بحد ذاته؛**

جاء في الاستحضار بأنّ الخدمات المصرفية للعملاء قد تعدّدت وتنوّعت بتنوّع التقنيات المصرفية ومنها التحاويل الخارجية، ويُعتبر التحويل للمدّعي أهم وسائل التنفيذ الممنوحة له وغير المرهقة كونه غير مقيم في لبنان، وهذا الإدلاء غير صحيح قانوناً.

فالتحويل، وفقاً لجميع الآراء الفقهية وللاجتهاد، هو خدمة مصرفية يعود للمصرف تأديتها أو عدم تأديتها اذا لم تكن مُلزمة له وفقاً لعقد التعامل الجاري بينه وبين عميله.

يُراجع بهذا المعنى:

قرار المحكمة الخاصة المصرفية – الهيئة الثانية – رقم ٧٧/٢٤٧ تاريخ ١٩٩٤/١٠/١٨ المنشور في صادر بين التشريع والإجتهاد – المصارف – الصفحة ٥٦١ حيث جاء ما يلي:

" حيث أن التحويل المصرفي هو *عملية رضائية تتم بمجرد تراضي أطرافها الثلاثة* لأن ما يعول عليه هو إمكانية تنفيذ التحويل الذي لا يمكن أن يتم فعلياً وينتج آثاره إلا عندما يتم نقل المبالغ فعلياً ."

وأيضاً:

قرار محكمة الإستئناف المدنية في بيروت رقم ٢٢ تاريخ ١٩٩٦/١/١١ المنشور في مجلة العدل للعام ١٩٩٦ – الصفحة ٤٥، حيث جاء ما يلي:

" وبما أنه من المتفق عليه علماً واجتهاداً، أن عملية التحويل التي تستوجب الركون الى مصرفين لإتمامها، تعتبر ناجزة بالنسبة للآخر *عندما يوافق مصرفه على أمر التحويل،* فيسجل في حسابه المدين المبلغ المحوّل. "

وأيضاً:

**Fadi Nammour, Droit bancaire. Réglementation. Comptes. Opérations. Services, édition 2003, p.571 :**

« *L'ordre de virement est un mandat donné par le client à sa banque de débiter son compte d'une somme déterminée et de créditer un autre compte du même montant. __Néanmoins, le donneur d'ordre ne peut pas valablement prétendre à son droit au virement qu'après acceptation de la banque de l'ordre ainsi donné__ (Beyrouth, 11 janvier 1996, Al Adl 1996, p.45) ce contrat est régi par le consensualisme.* »

والقول بأنّ التحويل هو تنفيذ لعقد التعامل المصرفي، أو أنه بات عملاً قانونياً شكلياً، انّما يشكل اضافةً على القانون وتعديلاً له وسوء تفسير لأحكامه.

وليس صحيحاً قطعاً أن التحويل الى الخارج بات عُرفاً مستقراً لدى المصارف، ذلك لأنّ التحويل كان يُعتمد فقط في معاملات استيراد البضائع من الخارج من قِبَل التجار، أو لغاياتٍ محددّة واستثنائية مثل الاستشفاء أو التخصّص العلمي.

٧

أمّا عامة الناس والمودعين ، فلا حاجة لهم للتحويل ولم يكن الأمر يهمَهم أو يعنيهم، والدليل على ذلك نستمده من هذه الدعوى بالذات حيث لم يسبق أن حولَ المدعي أي مبلغ الى الخارج.

ولكن نذهب أبعد من ذلك؛

فالتعامل اليوم، في لبنان أو خارجه، يجري عبر بطاقات الائتمان المصرفية: فهل اصبحت هذه الخدمة الزامية ايضاً للمصارف؟ بمعنى ان البنك ملزم بإعطاء بطاقة لأي شخص يطلبها.

ونضيف:

لا يوجد في القانون اللبناني أي نص يُلزم المصرف بإيفاء أي دين أو إعادة أي وديعة عبر التحويل الى الخارج، بل أنّ القانون واضح في القول بأن وسيلتي الأيفاء المعترف بهما قانوناً هما إما الايفاء العيني (المادة /٢٤٩/ موجبات) وإمّا الإيفاء بالشيك (المادة /٣١٧/ موجبات)، **وفقاً لإرادة المدين المُطلقة**.

والمشترع الفرنسي، وكذلك المشترع الأوروبي، وضعا نصوصاً تشريعية واضحة وصريحة تتناول وسائل الإيفاء العديدة، وذكرا بينها التحويل، بالإضافة الى عدة وسائل أخرى الكترونية فرضها التطوّر التكنولوجي:

**Répertoire de droit commercial, Enc. Dalloz, Virement, par Régine BONHOMME, Octobre, 2018, numéro 48 :**

*« Le virement fait partie de ce que la législation européenne dénomme instruments de paiement, un instrument qui n'utilise pas nécessairement de support matériel (comme le serait un bordereau papier ou une carte plastique) (...).*

*Le rôle des banquiers dans cette conception, a un aspect matériel et purement technique : ils procèdent aux écritures en comptes qui réalisent le transfert de fond.»*

وفي القانون الفرنسي، تنصّ المادة  L-311-3 من القانون النقدي والمالي  Code monétaire et financier على ما يلي:

*« Sont considérés comme moyens de paiement tous les instruments qui permettent à toute personne de transférer des fonds, quel que soit le support ou le procédé technique. »*

أمّا في لبنان، فلا يوجد أي نص لا في قانون الموجبات ولا في قانون التجارة ولا في قانون النقد والتسليف يشير الى أنّ التحويل هو وسيلة من وسائل الإيفاء على غرار المادتين /٢٤٩/ و/٣١٧/ من قانون الموجبات والعقود، ولا يوجد أي نص جامع على غرار النص الفرنسي، بل أنّ القانون حدد وسيلتين الزاميتين فقط للإيفاء النقدي والإيفاء بالشيك، **وفقاً لإرادة المدين المُطلقة**.

٨

ونذكر مجدداً بأحكام المواد /٣٠٢/ و/٧٠٤/ و/٧٦٤/ موجبات وعقود التي تنصّ على أن ردّ الوديعة يتمّ في مكان إجرائها، أي في لبنان.

III– واستطراداً، يقتضي رد الدعوى لاستعداد المدعى عليه تسديد المبلغ بواسطة شيك مصرفي :

وبأي حال، وعلى سبيل الاستطراد، يبقى أنّ الدعوى مستوجبة الرد كون المدعى عليه على استعداد لتسديد المبلغ الذي يؤول إلى المدّعي بواسطة شيك مصرفي مسحوب على مصرف لبنان، وهو وسيلة دفع قانونية بامتياز والأكثر تعاملاً في لبنان.

ولا نعتقد أننا بحاجة لإيراد إجتهادات عديدة بهذا الشأن، مكتفين بإيراد ما يلي:

حكم قاضي الأمور المستعجلة في بيروت، صادر في ٢٠٢٠/١/٢٢، غير منشور، حيث جاء ما يلي:

" وحيث أن المشرع اللبناني ولكي يضمن للشيك وظيفته كوسيلة للإيفاء، كرّس له العديد من الضمانات التي تجعل منه آداة أكيدة للإيفاء تحلّ محل النقود عند الدفع، لا سيّما عند تقرير الأحكام المتعلّقة بالمؤونة والتظهير وكفالة الإيفاء والرجوع الصرفي والتضامن ومرور الزمن القصير، غير أن المشرع لم يكتف بتكريس قواعد الصرف فيما يتعلّق بالشيك، إنّما أضاف إليها ضمانة إضافية ألاَ وهي ضمانة العقوبة في حال إصدار شيك دون رصيد."

وأيضاً: الهيئة العامة لمحكمة التمييز– قرار تاريخ ١٩٧٤/١٠/١ – العدل ١٩٧٥ – ص ١٩٣.

ولا بدّ من تذكير المدعي بأنه كان يغذّي حسابه لدى البنك المدعى عليه بواسطة التحاويل الداخلية وبالشيكات، كما بيّناه أعلاه، فلماذا يحق له ذلك ولا يحق للفريق الآخر في العقد (أي المصرف المدعى عليه) الدفع بالشيك.

فتكون الدعوى مستوجبة الردّ.

IV– وأكثر استطراداً، في وجوب ردّ الدعوى لتوفر القوة القاهرة :

على سبيل الاستطراد الكلّي، يبقى أنّ ما يحدث في لبنان منذ ١٧ تشرين الأوّل ٢٠١٩ وحتى الساعة، نتيجة الإنهيار الإقتصادي غير المسبوق وكذلك نتيجة جائحة كورونا، يشكّل قوة قاهرة بكل ما للكلمة من معنى. وقد أقرّ المشترع اللبناني بالذات بتوفر القوة القاهرة منذ ٢٠١٩/١٠/١٧، عندما ذكر صراحةً، في الأسباب الموجبة لقانون تعليق المهل القانونية والقضائية والعقدية رقم ٢٠٢٠/١٦٠، أنّ ما شهده لبنان

٩

منذ ١٧ تشرين الأول ٢٠١٩ من أحداثٍ استثنائية يتصف في ظروفه وحيثياته بالخطيرة، "مما *حال بفعل القوة القاهرة* المتأتية عنه دون ممارسة الدولة والمواطنين لحقوقهم (...)"

إنّ هذا الأمر يُشكّل إقراراً بحد ذاته بوجود القوة القاهرة، والتي عرّفها الفقه بأّنها "*الحدث المفاجئ المتصف بعدم التوقّع وعدم إمكانيّة مقاومته أو تجاوزه* " **(القاضي مصطفى العوجي، القانون المدني، الجزء الأول، العقد، ص. ٦٨٥ وما يليها).**

وهنا نسأل: هل كان متوقّعاً حدوث الإنهيار الإقتصادي بهذا الشكل ؟ ألم يكن المسؤولون في الدولة، وعلى رأسهم حاكم مصرف لبنان، يطمئنون اللبنانيين بثبات سعر صرف الليرة وبأّن أموالهم لدى المصارف هي في أمان؟

وهل كان من الممكن توقّع جائحة كورونا التي قضت على ما تبقّى من مقوّمات الإقتصاد المحلي لا بل العالمي؟

**وهذه الأمور غير المتوقعة تلتقي مع الشروط التعاقدية الواردة في العقد الذي يربط الطرفين والتي أوردناها في اول هذه اللائحة أعلاه.**

بالتالي،

وفي ظل القوة القاهرة، يكون المصرف المدعى عليه مُعفى من أداء أي خدمة كان بإمكانه القيام بها سابقاً (هذا على فرض توجّب هذه الخدمة – الأمر الذي ننفيه).

يُراجع على سبيل المثال:

**القاضي مصطفى العوجي، المرجع عينه:**

" *إجمالاً، تنتج استحالة التنفيذ عن حدثٍ طارئ خارج إرادة الإنسان فيحول دون إمكانية تنفيذ إلتزامه، كحرب تُشنّ أو ثورة تندلع أو حريق يشب في مستودعه فيقضي على البضائع التي تعهّد بتسليمها للمشتري. يُعبّر عن هذا الحدث بالقوة القاهرة أو الحدث المفاجئ المتصف بعدم التوقع وعدم إمكانيّة مقاومته أو تجاوزه، ويكون من نتائجه إعفاء المدين من التزاماته (...).*"

بالتالي،

يكون المصرف المدعى عليه غير ملزم بتنفيذ خدمة التحويل إلى الخارج في ظل القوة القاهرة التي أّدت إلى عدم توفر العملة الورقية بالدولار الأميركي،

ويقتضي إذاً رد دعوى المدّعي برمّتها.

**V– واستطراداً كلّياً، في وجوب ردّ الدعوى أساساً:**

على سبيل الاستطراد الكلّي، إنّ مطالب المدّعي مستوجبة الرد أساساً لا سيّما للأسباب التالية:

– كون العقد الموقّع بينه وبين المدعى عليه يجعل هذا الأخير غير مسؤولٍ عن عدم توفّر العملة
النقدية الأجنبية.

– كون المدعي أودع أكثرية أمواله في الحساب بواسطة الشيكات والتحاويل.

– كون المصرف المدعى عليه يلتزم بتعاميم وقرارات مصرف لبنان لا سيّما التعميم رقم ١٥٤، الذي
يُلزم المصارف بحث العملاء الذين حوّلوا مبالغ إلى الخارج منذ العام ٢٠١٧، إلى إعادة جزء
منها إلى لبنان، ما يعني أنه لا يحق للمصارف إجراء حالياً أية تحاويل مالية إلى الخارج.

– كون تمكين المدعي من تحويل المبلغ المطلوب إلى الخارج يشكّل مخالفةً لمبدأ المساواة مع سائر
المودعين Une rupture du principe d'égalité، وهذا أمرّ غير جائز.

لكل ما تقدّم،

يقتضي ردّ الدعوى أساساً.

<div dir="rtl" align="center">

**لجميع هذه الأسباب،**

**ولما قد يُدلى به لاحقاً،**

**أو لما قد تراه رئاستكم المحترمة عفواً،**

</div>

يطلب المصرف المدّعى عليه من محكمتكم المحترمة ردّ ما جاء في استحضار الدعوى، وبالنتيجة الحكم
وفقاً لما يلي:

**أوّلاً:** ردّ الدعوى شكلاً في حال عدم تسديد الرسم النسبي المتوجّب، وإلاّ ردّها شكلاً في حال تبيّن
مخالفتها أي في الشروط الشكلية المحدّدة قانوناً.

**ثانياً:** واستطراداً، ردّها أساساً لعدم صحتّها وعدم قانونيتها، وإلاّ لاستعداد المدّعى عليه لتسديد المبلغ
بواسطة شيك مصرفي مسحوب على مصرف لبنان، وإلاّ ردّ الدعوى أساساً لتوفّر القوة القاهرة.

**ثالثاً:** واستطراداً كلياً، ردّ الدعوى أساساً لعدم قانونيتها وعدم صحّتها، ورد طلب الحكم بالغرامة الإكراهية.

**رابعاً:** تضمين المدّعي النفقات كافة وأتعاب المحاماة ورسم صندوق تعاضد القضاة.

في ٢٠٢١/٤/٢٢                                          بكل تحفظ وإحترام
بالوكالة
المحامي شكيب قرطباوي