UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
In re *Ex Parte* Application of Majed Amir Al-Attabi, :
:
                                                *Petitioner,* :
: Case No. 1:21-mc-00207(VSB)
for an Order Pursuant to 28 U.S.C. § 1782 to Take :
Discovery for use in Foreign Proceedings Pending :
in the Republic of Lebanon. :
------------------------------------- x

**DECLARATION OF AREF EL-AREF IN OPPOSITION TO MOTION OF BANK AUDI S.A.L. TO QUASH SUBPOENAS ISSUED PURSUANT TO 28 U.S.C. § 1782**

I, AREF EL-AREF, declare as follows pursuant to 28 U.S.C. § 1746:

       1.       I am the Lebanese attorney representing the Petitioner in the foreign proceeding for which this Court has authorized discovery to be taken pursuant to Section 1782. I respectfully submit this declaration in opposition to the motion by Bank Audi S.A.L. ("**Bank Audi**") to quash subpoenas issued pursuant to this Court's Opinion and Order of September 3, 2021 (ECF 10) (the "**Order**") and to respond to certain statements in the October 11, 2021 Declaration of Dr. Ghaleb Ghanem (ECF 22) about my February 26, 2021 declaration in support of the Section 1782 Petition (ECF 5), as well as to certain statements made in Bank Audi's Memorandum of Law (ECF 19). Contrary to these statements, the information I provided to this Court in my February 26 Declaration was complete and accurate.

      2.       I refer to my February 26 Declaration which sets forth my legal qualifications and professional experience as an attorney in Lebanon. (ECF 5 at ¶¶ 3-9).

      3.       Annexed hereto as **Exhibit 1** is a legal opinion provided to the Petitioner by Dr. Abdo Jamil Ghossoub, in Arabic together with a certified English translation. Dr. Ghossoub is a Professor of Law in Lebanon and Lawyer member of the Lebanese Bar, licensed to practice law in Lebanon, holder of PhD in Private International Law and a recognized legal expert in Lebanese Law by several international organizations, including international arbitration institutions. Dr.

Ghossoub has written several books on private international law and conflict of laws, he has also written extensively in the field of Lebanon civil procedures, including more than two hundred studies and articles in numerous journal articles in Lebanon and in the Middle East region.

**I.    DISAGREEMENT WITH DR. GHANEM REGARDING THE SIGNIFICANCE OF ARTICLES 139 AND 140 OF THE LEBANON CIVIL PROCEDURES CODE**

4.    I have read the declaration of Bank Audi's expert witness Dr. Ghanem in the original Arabic as well as the English translation. (ECF 22) In his declaration, Dr. Ghanem refers to my February 26 Declaration as "false" and "inaccurate", and he states that I have misinterpreted Articles 139 and 140 of the Lebanon Civil Procedures Code. Dr. Ghanem does not state whether he has read my February 26 Declaration (which is written in English only). His declaration quotes a passage from the Order but does not quote from my February 26 Declaration. Dr. Ghanem's statements about my declaration are incorrect, as I will explain below.

5.    I note that Dr. Ghanem is no longer a judge in Lebanon. He no longer works for the Ministry of Justice of Lebanon. He is a private citizen who has no authority to make statements that are binding on Lebanon's government or the courts of Lebanon. He is offering a legal opinion on behalf of his client, Bank Audi.

6.    In my February 26 Declaration, I referred to Articles 139 and 140 of the Lebanon Civil Procedures Code to provide some context for my opinion that the Lebanese Civil Court will most likely welcome this Court's assistance under Section 1782. (ECF 5 at ¶¶ 28, 41) Articles 139 and 140 contemplate that Lebanese courts will in some instances apply the laws of foreign countries to resolve legal disputes before them, and will consider evidence obtained in foreign countries in accordance with the procedures of those countries.

7.    Dr. Ghanem takes my statements out-of-context when he states "Article 139 [and Article 140] cannot be invoked to justify obtaining Discovery issued by a foreign judge." (ECF 22

2

at 12) My February 26 Declaration does not state that these Articles provide a mechanism for a Lebanese litigant to obtain discovery in the United States. Section 1782 provides that mechanism. However, Articles 139 and 140 apply to that discovery once it has been obtained: (a) Article 139 provides that the judge presiding over the Lebanese Civil Action will determine whether to admit the discovery into evidence and rely upon it[1], and (b) Article 140 provides that the procedures for obtaining evidence in a foreign country must not be contrary to Lebanese law[2].

8.  I have read Bank Audi's Memorandum of Law in support of its motion to quash Petitioner's subpoenas. This document states that my February 26 Declaration misled this Court because I made reference to Article 140 of the Lebanon Civil Procedures Code "without informing the Court that Article 140 contemplates admission of such evidence only when obtained pursuant to a mandate from a Lebanese judge." (ECF 19 at 18) This is not a correct interpretation of Article 140. Article 140 states "*Evidence procedures are subject to the law of the judge before whom the said procedures are taking place. However, the evidence procedures that took place in a foreign country are considered valid if they conform to the provisions of the Lebanese law, even if they are in violation of the foreign law. It is possible to delegate a foreign court to take evidentiary measures necessary for the case*." The final sentences of Article 140 permits Lebanese courts to request assistance from foreign courts in gathering evidence. It does not prevent Lebanese litigants from gathering evidence in foreign countries without an order from a Lebanese court. There is no provision of Lebanese law that forbids litigants from obtaining discovery in the United States pursuant to Section 1782. Under Article 139, the judge presiding over the Lebanese Civil Action

---

[1] "*Acceptance of evidence of material acts is subject to the law of the judge examining the dispute.*" Article 139. Dr. Ghanem correctly states that the evidence of Bank Audi's U.S. dollar transfers and U.S. dollar deposit accounts in New York is a "material fact" for purposes of Article 139. (ECF 22 at 11)

[2] "*Evidence procedures are subject to the law of the judge, before whom the said procedures are taking place. However, the evidence procedures that took place in a foreign country are considered valid if they conform to the provisions of the Lebanese law, even if they are in violation of the foreign law.*" Article 140

will decide whether evidence of material acts is admissible.

9. Bank Audi's Memorandum of Law in support of its motion to quash Petitioner's subpoenas also states "Here, Petitioner has no procedural mechanism to inject the requested discovery into the Lebanese Action." (ECF 19 at 9) This statement is false. Lebanese civil procedure is modelled on French civil procedure. In both systems, the parties themselves initiate the proceeding, identify their claims and the relevant facts, and take primary responsibility for bringing forth evidence to sustain their factual allegations. The discovery obtained from the Respondent banks can be submitted to the Lebanese Civil Court.

10. I disagree with Dr. Ghanem's statements that the Lebanese Civil Court will refuse to admit the discovery into evidence, and that it is contrary to Lebanese law for a litigant to obtain U.S.-style discovery. These are simply Dr. Ghanem's opinion, for which he provides no support. Dr. Ghanem himself notes that Lebanese judges have "wide authority in the management of the lawsuit, especially with respect to the management of the rules of evidence". (ECF 22 at 6)

11. In 2015, I was professionally involved in a case in which Lebanese judicial authorities (public notaries) supervised the taking of U.S.-style discovery in Lebanon (in the form of depositions upon oral examination) in response to a letters rogatory request issued by the California Superior Court in Contra County in, *the Estate of Nejme Elias Diab* (PROMSP14-00321, 2014, Cal. Super.) This could not have occurred if U.S-style discovery was illegal in Lebanon, as Dr. Ghanem claims.

12. I have been a litigator in Lebanon for fourteen (14) years, and I am not aware of any instance in which a Lebanese court has refused to consider evidence that was obtained in the United States pursuant to Section 1782.

13. Lebanon Civil Procedures Code does not provide for broad U.S.-style discovery, but it does not prevent litigants from gathering proofs anywhere in the world and presenting that

evidence to the courts. Dr. Ghanem's declaration states the "under Lebanese law, the judge is the only authority who has the ability to request the production of evidence (for example, witness testimony, documents) from a third party…. [N]o party may independently from the judge overseeing the dispute seek evidence from a third party." (ECF 22 at 5) This is not correct. The Lebanon Civil Procedures Code empowers litigants to compel the production of evidence by opponents and third parties without obtaining a court order. (Articles 203-209). Under Lebanese civil procedure, the litigants, through their legal counsels, play a positive role in proof gathering, they are the ones who gather and present evidence to court, discuss it, refute it and prove its opposite when necessary. Even without U.S.-style discovery, litigants are able to gather evidence from many sources, without the courts' involvement, as explained in the declaration of Petitioner's Lebanese legal expert, Dr. Ghossoub at Exhibit 1 hereto.

14. Petitioner intends to use the discovery from the Respondent banks concerning Bank Audi's U.S. dollar transfers and U.S. dollar deposits to refute Bank Audi's *force majeure/*illiquidity defense which is based on Bank Audi's factual assertion that it has suspended payments because it lacks access to sufficient U.S. dollar currency (or banknotes) to honor Petitioner's transfer instructions. Those are "*material legal facts*" according to Article 257 of of the Lebanon Civil Procedures Code, and evidence related to "*material legal facts*" can be proven by litigants by any method.

15. Furthermore, in a "merchant" case such as the Lebanese Action (in which Bank Audi qualifies as a "merchant" under Article 6 of the Lebanese Commercial Code), according to Article 257 of the Lebanon Civil Procedures Code and Article 254 of Lebanese Commercial Code, the principle of "*freedom of proof*" applies. This means that the law does not limit the type of

evidence that can be submitted against a merchant, or prescribe a particular standard of proof.[3] Accordingly, the Lebanese Civil Court will have very broad discretion in determining whether to admit and rely upon the discovery.

## II.     BANK AUDI'S FORCE MAJEURE DEFENSE

16.     Bank Audi's Memorandum of Law in support of its motion to quash Petitioner's subpoenas states that Petitioner misled this Court because he "did not inform the Court that the hypothetical defense of U.S. dollar illiquidity, which [he] 'anticipated' Bank Audi would raise in the Lebanese Action, was not asserted in Bank Audi's responsive pleading." (ECF 19 at 18) This allegation is not correct. The force majeure defense alleged in Bank Audi's "*First Response*" is the illiquidity defense that I had anticipated. Bank Audi has pled that it is no longer bound by its contractual obligation to transfer Petitioner's funds to the UAE "in light of the force majeure that led to the non-availability of banknotes in US dollars." (ECF 21-2 at 13) I intend to use the discovery concerning Bank Audi's U.S. dollar transfers and U.S. dollar deposits in New York to refute this supposed force majeure defense.

17.     Pursuant to Lebanon Law, a force majeure is an event which renders the performance of contractual obligations impossible and which the obligor must prove to exist[4]. Both doctrine and case law define a force majeure event as follows: "Force majeure is an unforeseen unavoidable external event beyond parties' control that prevents one or both parties to a contract from performing their obligations"[5]. Accordingly, pursuant to Lebanon law and case law, force majeure can be invoked when the three following conditions are met: (i) *unforeseeable*, meaning

---

[3]  *See, Court of Cassation, Decision number 28/2006 dated February 12, 2006, fourth chamber and Court of Cassation, Decision number 3/2012 dated November 10, 2012, fourth chamber.*

[4]  *Article 342 of the Lebanon Code of Obligations and Contracts, dated on March 9, 1932.*

[5]  *Article 341 of the Lebanon Code of Obligations and Contracts, dated on March 9, 1932.*

6

that the event could not reasonably have been foreseen at the time the contract was entered into, (ii) *Irresistibility*, meaning that the effects cannot be avoided by appropriate measures, and (iii) *Unavoidability*, meaning that the impossibility of performing the contract arises due to an event outside the control of the obligor.

18. Article 342 of the Lebanon Code of Obligations and Contracts, provides that: "*An Obligor shall provide evidence on force majeure and an Obligee shall also have the right to prove that the emergent event fallen upon an Obligor occurred due to a mistake of an Obligor such as defaulting on fulfillment resulting in delaying. In this case, an obligation shall remain in effect*".

19. According to the said Article 342 of the Lebanon Code of Obligations and Contracts, *the impossibility* must be absolute and should result from a cause far from an act of an obligor/debtor, who shall prove the force majeure and the compelling event, including the characteristics of impossibility.[6]

20. In my February 26 Declaration I described certain unlawful *de facto* capital control measures promoted by the Association of Banks in Lebanon ("**ABL**"), which is a private industry association that has no legal authority to control the activities of banks in Lebanon. (ECF 5 at ¶19) ABL has directed Lebanese banks not to transfer outside of Lebanon any U.S. dollar deposits held by their customers. (ECF 5 at ¶19) That directive cannot constitute a force majeure event because it is not irresistible, nor is it an event outside Bank Audi's control. Bank Audi is a voluntary member of the ABL, which does not exercise coercive power over its member banks.

21. More generally, Bank Audi has participated in causing the collapse of the economy in Lebanon, at least indirectly when it introduced "financial engineering" with the Central Bank of Lebanon through swap of Lebanese Pound treasury bills held in its portfolio with equivalent

---

[6]   *Article 342 of the Lebanon Code of Obligations and Contracts, dated on March 9, 1932.*

USD denominated Eurobonds issued by the Republic of Lebanon, that enabled Bank Audi to attract foreign investors/depositors to make deposits in USD currency by offering high interest rates. Accordingly, Bank Audi is itself at fault for the alleged "non-availability of banknotes in US dollars" and its contractual obligations to the Petitioner would remain in effect even if (as it alleges) it does not have sufficient USD liquidity to transfer Petitioner's $4.3 million to the UAE.

### III. LEBANON BANK SECRECY LAW

22. Annexed hereto as **Exhibit 2** is the official English translation of Lebanon's Bank Secrecy Law (Law of September 3, 1956 On Banking Secrecy), as published by the Central Bank of Lebanon on its website[7].

23. The Bank Secrecy Law does not apply to the discovery for the following reasons

- According to Article 1 of the Lebanon Bank Secrecy Law, banks that are bound by the secrecy law are Lebanese banks and branches of foreign banks operating in Lebanon, and since the discovery is sought from Banks located in New York, those are not subject to Lebanon Bank Secrecy Law.

- According to Article 2, the Lebanon Bank Secrecy Law protects information about the Lebanese banks' customers' "names, funds, or personal matters" and not information about the Lebanese banks' own accounts.

- In addition, according to Article 2, the Lebanon Bank Secrecy Law will be waived upon any dispute between the client and the bank and whereas there is a legal dispute between the client who is seeking for evidence related to liquidity of Bank Audi, banking secrecy will not be a reason for not using any evidence as a proof of liquidity for Bank Audi.

### V. DISCOVERY OF BANK AUDI'S COMMUNICATIONS WITH RESPONDENT BANKS ABOUT THE SUBPOENAS AND THIS PROCEEDING

24. Bank Audi moves, in the alternative, to quash document request #4 in the subpoenas served pursuant to the Order. This request seeks: "Any communication between [Respondent

---

[7] *See,* https://www.bdl.gov.lb/laws/download/2/en

Bank] and Bank Audi concerning this subpoena, [Respondent Bank's] response thereto, or Petitioner's February 26, 2021 application to the U.S. District Court for the Southern District of New York pursuant to 28 U.S.C. § 1782 and the Court's order granting same." This discovery seeks evidence of any efforts by Bank Audi to interfere with Petitioner's efforts to gather evidence about Bank Audi's USD liquidity.

25. This discovery is potentially relevant to the Lebanese Action in two respects. First, Article 278 of the Lebanon Civil Procedures Code forbids parties from trying to influence a potential witness. Any evidence that this has occurred could be submitted to the Lebanese Civil Court. Second, in the Lebanese Action Petitioner, who is a citizen of the Kingdom of Saudi Arabia, asserts claims against Bank Audi pursuant to the provisions of the bilateral treaties between the Republic of Lebanon and the Kingdom of Saudi Arabia which provides that "*each contracting party that has investments invested by investors from the other contracting party shall grant such investors with free transfer of payments related to these investments and in a transferable currency*".

26. In addition, as submitted in the Lebanese Action by the Petitioner, both Lebanon and Kingdom of Saudi Arabia are parties to (A) the Agreement for Promotion, Protection and Guarantee of Investments among Member States of the Organization of the Islamic Conference (the "**OIC Agreement**"), which was adopted in June 1981 and entered into force in February 1988 for those States that had ratified it by that date, and (B) the Unified Agreement for the Investment of Arab Capital in the Arab States (the "**Arab Investment Agreement**"), which was signed on 26 November 1980 and entered into force on 7 September 1981 after its ratification by 20 Member States of the League of Arab States, including Lebanon and the Kingdom of Saudi

Arabia. Lebanon ratified the OIC Agreement on 6 March 2005[8], and the Arab Investment Agreement on 19 February 1985.

27.     The OIC Agreement contains typical investment protection provisions, including a most favored nation (MFN) provision (Article 8), protection against expropriation (Article 10), free transfer of funds and capital (Article 11), and national treatment with respect to compensation for losses suffered (Article 14). Like the OIC Agreement, the Arab Investment Agreement contains many of the typical investment protection provisions, including MFN provision in Article 6(2), accordingly the MFN provision provides substantial protections to investors such as the Petitioner, including "*fair and equitable treatment*" (FET) standard such as it is the case in any other bilateral investment treaties concluded by the Republic of Lebanon with third-party States. And the "*free transfer*" provisions found in each of Lebanon's investment treaties guarantees Petitioner's rights to freely transfer funds relating to his investment (his deposits in Bank Audi) and returns on that investment in and out of Lebanon. Such funds may include the initial capital and the returns (i.e., interest).

28.     This discovery is also potentially relevant to the Lebanese Action to establish evidence of bad faith on the part of Bank Audi, through the interference with the subpoenas, sufficient to constitute a breach of the FET Obligation under the bilateral treaties between the Republic of Lebanon and the Kingdom of Saudi Arabia, the OIC Agreement and the Arab Investment Agreement. Similarly, a successful claim for violation of a "*fair and equitable treatment*" standard would allow Petitioner, not only to recover the banking deposits that they cannot access, but also to be awarded damages for consequential harm in the Lebanese Action.

---

[8]   *See,* List of Member States who Signed/ Ratified the Different Agreements and Statutes on Economic, Commercial and Technical Cooperation among OIC Member States', Doc. OIC/ECO-04/38/2008 dated 30 October 2013.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Beirut, Lebanon this 15th day of November 2021.

_____
Aref El-Aref