**Translation**

*(On a paper with the letterhead of **Judge Doctor Ghaleb Ghanem** - Honorary First President of the Court of Cassation - Former President of the Supreme Judicial Council - Former President of the State Consultative Council - Arbitration - Legal Advices)*

### Additional legal opinion
### On the admissibility of the Discovery process before the Lebanese courts

<u>The Party seeking the opinion:</u> **Bank Audi SAL, represented by its attorney at law, the ex-President of the Bar Association Chakib Cortbaoui**

**Subject: Addressing questions related to a previous legal opinion that I have drawn up about the admissibility of the Discovery process in Lebanon, and based on a legal opinion drawn up pursuant to the request of the party seeking the Discovery.**

\*\*\*

Further to what was stated in a previous legal opinion that I had given at the request of Bank Audi SAL;

And for the purpose of addressing the questions that constitute the subject of the current opinion, emanating from another legal opinion drawn up pursuant to the request of the party seeking the Discovery;

I will answer the raised questions sequentially, stating the following:

**I- At page 3 of his opinion (Arabic at 3), Dr. Ghossoub states that "a non-merchant party can use all the evidence against the merchant party, pursuant to the principle of "freedom of proof" evidence in commercial matters, provided that this method does not violate the procedural legal public order and the binding laws in Lebanon."**

"Evidence for use by the Plaintiff (singer) against the Defendant (a bank) - the merchant -and therefore you can use against the Bank -  merchant — any all the available evidence, as non-merchant can use all the evidence against the merchant party, pursuant to the principle of "freedom of proof" evidence in commercial matters, provided that this method does not violate the procedural legal public order and the binding laws in Lebanon."

> a. **Does "freedom of proof" apply to the trial of Al-Attabi's claims against Bank Audi in Lebanon?**
>
> b. **If so, does "freedom of proof" override the exclusive authority given to the Lebanese judge under Article 140 to mandate a foreign court to carry out the evidentiary procedures needed to rule on a case?**

***

> a. Does "freedom of proof" apply to the trial of Al-Attabi's claims against Bank Audi in Lebanon?

- **When the debate is about whether the Lebanese law accepts or not, resorting to a certain procedure in the search for evidence (the Discovery in the present case),it becomes useless and even more so irrelevant to discuss the principle of the "freedom of proof".**

The principle of the "freedom of proof" in Lebanon is referred to in Article 254 of the Code of Commerce, which permits proving commercial contracts by all means of proof that the judge deems necessary to accept, and in Article 257 of the Code of Civil Procedure, which permits the proof by witness testimony in commercial matters, regardless of the value of the case.

**However, this principle, which is originally intended to facilitate dealings in the commercial field, collides with peremptory and binding legal and procedural rules**

**related to public order. <u>What is prohibited by binding rules cannot be raised again from another perspective, such as the perspective of freedom of proof.</u>**

Public order restricts some freedoms, including the freedom of trade (which is accompanied by the freedom of proof in commercial cases).

On the priority of the Public Order, see:
- "The public order leads to the restriction of some freedoms."

(Guillaume Drago, 2013 yearly report of the Courtof Cassation, Paris, under the title: The Public Order, p.91)

**The Public Order as a limitto freedoms** : The freedom to get married, to go on strike… <u>or even yet the freedom of trade</u>… may compete with the public order rules that restrict them."

(2013 yearly report of the French Court of Cassation, Ib., p.429)

The adoption of this principle in commercial cases (the Codeof Commerce, the Code of Civil Procedure) and in other cases specified by Article 257 of the Code of Civil Procedure (the presence of a written instrument without a signature issued by one of the parties, the moral impossibility resulting from the norm in some professions or from kinship relations, the loss of the written instrument for an extraneous reason over which the litigant has no control...) <u>Its adoption was for the purpose of expanding the scope of recourse to evidence due to the nature of the fact or the act to be proven (such as a commercial transaction) or their circumstances (such as the impossibility of obtaining a bond due to kinship...) not for permitting what is forbidden to resort to in the first place (such as resorting to the Discovery process).</u>

In any case, Dr. Ghossoub himself stated in his legal opinion (p. 3 of the Arabic version) that the principle of the freedom of proof is being applied in commercial materials, "provided that this method does not violate the procedural legal public order and the binding laws in Lebanon."

3

It must be borne in mind, in the same regard, that Article 254 of the Code of Commerce has linked the principle of invoking all the means of evidence to the decision of the judge hearing the case, who is the one who assesses whether these means are acceptable or not.

> b.  If so, does "freedom of proof" override the exclusive authority given to the Lebanese judge under Article 140 to mandate a foreign court to carry out the evidentiary procedures needed to rule on a case?

I asserted under section (a) of this question, that the principle of the freedom of proof must be excluded from the matter at hand.

In any case, in a provisionary manner and alternatively, I draw attention to the fact that the allegations of Mr. Al-Attabi in their various aspects in general, and his invocation of the principle of the freedom of proof in particular, do not revoke any of the procedural rules set forth in Article 140 of the Code of Civil Procedure (such as the fact that the evidentiary procedures are subject to the law of the judge before whom they are carried out...) and do not revoke the authority of the judge to mandate a foreign court if he deems it useful in the case.

I note that the evidentiary procedures are subject to the law of the judge hearing the case.

See in this respect:

"Matters of evidentiary procedures -we indicate that this latter type of matters, i.e. the matters of the procedures and the conditions to be followed for the submission of proof, are recognized to be subject to the law of the judge hearing the case or proceeding with the evidentiary procedure...

Unless the judge's law is observed in all of this, the procedure that was taken is deemed null and void, and its nullity will result in the nullity of the judgment that was based on it.

(Dr. Sleiman Morcos, Principles and Procedures of Evidence, Absolute Evidence, Fifth Edition 1991).

4

See also:

"Finally, when it comes to determining the probative value of the various means of proof, it is in principle appropriate to refer to the law of the forum, since, when it comes to fixing the credit that the judge must grant to such or such means of proof, this matter directly concerns the activity of the magistrate."

(Dalloz, Commercial and Corporate Law Directory, Tome II, 1957, Proof, N.118, P.650)

**II- At page 9 of his opinion (Arabic at 11-12), Dr. Ghossoub opines that "Article 139, in both cases of its application [to legal acts and material acts], permits the application of the Discovery procedure as a means of proof." He bases this conclusion on an assertion that "the legal acts to be proven were established in America" or, that from the perspective of the correspondent banks, "legal acts are material acts for them" and "material acts can be proven by various means."**

"Therefore, Article 139, in both cases of its application, permits the application of the Discovery procedure as a means of proof.

In the above two cases, American law is applicable because the legal acts to be proven were established in America and are subsequently subject to American law, which embraces 'Discovery'. And if we consider that the effects of these legal acts took place in Lebanon, then the Lebanese law considers in the terms of a third party– and you are from the category of third parties as you are not parties to the mentioned legal acts – that legal acts are material facts for them, and the material acts can be proven by various means, so what is the impediment to proving through the Discovery procedure?!"

> a. **Do you agree that the evidence sought from the correspondent banks involves any "legal acts"? If not, why is he wrong?**
>
> b. **You have opined in this case that some of the evidence sought from the correspondent banks (the information about Bank Audi's assets) concern "material acts." Is this also true of the other**

information sought in the subpoenas (the information about overseas transfers made by other Bank Audi customers, and any communications between Bank Audi and the correspondent banks about the subpoenas)?

c. For any "material acts," do you agree with Dr. Ghossoub's conclusion that Article 139 "permits the application of the Discovery procedure?" If not, why is he wrong?

a. Do you agree that the evidence sought from the correspondent banks involves any "legal acts"? If not, why is he wrong?

- What was stated in Dr. Ghossoub's opinion about legal acts differs from what is meant by the "legal acts" mentioned in the Code of Civil Procedure, and in Lebanese laws in general.

At least, what was stated in the opinion about the nature of these acts was ambiguous.

Article 147 of the Lebanese Code of Obligations and Contracts defines a legal act as follows:

"The legal act is the act that produces legal effects and, in particular, creates obligations.

The legal act that creates obligations may be carried out by one party (such as a party's declaration of its will) or may be an agreement, then it is expressed in the contract."

From this definition, sale, lease, or agency, as well as wills or donations... are legal acts. The contract between the bank and the customer is a legal act.

In addition to what was stated in Article 139 of the Code of Civil Procedure regarding legal acts, Article 131 of the same Code differentiates between a fact (which is a material act) and a legal act. It provides as follows:

"The proof is the establishment of evidence before the court of a fact or a legal act..."

6

Also, Article 138 of the same Code subjected the acceptance of evidence of legal acts to the applicable rules at the date of the establishment of these acts, and subjected the evidence of material acts to the applicable rules at the date of filing the lawsuit.

**In light of what was presented above about the notion of the legal act, the alleged transfers to be proven are out of the scope of this notion.**

- Alternatively, if we consider that the transfers, if they have occurred, are legal acts, they are considered material acts with respect to third parties (Clause 2 of Article 257 of the Code of Civil Procedure). Evidence of material acts, as per the second paragraph of Article 139 of the Code of Civil Procedure, is subject to the law of the judge hearing the dispute, that is the Lebanese law in the current case, given that the dispute is pending before the Lebanese court.

- There is no point in saying - as stated in the opinion of Dr. Ghossoub (p. 11 of the Arabic version) that these acts may be proven by various means of proof, including the Discovery process, because the dispute revolves around the principle of admissibility of the Discovery process before the Lebanese judge, not around the means of proof of the material acts.

> b. **You have opined in this case that some of the evidence sought from the correspondent banks (the information about Bank Audi's assets) concern "material acts." Is this also true of the other information sought in the subpoenas (the information about overseas transfers made by other Bank Audi customers, and any communications between Bank Audi and the correspondent banks about the subpoenas)?**

I have explained in my answer to section (a) of this question that the transfers for the benefit of third parties - if they have occurred - are considered material acts with respect to the party seeking the Discovery. The same solution applies to the correspondence between Bank Audi and the correspondent banks.

7

I do not share Dr. Ghossoub's conclusion that Article 139 permits the application of the Discovery process because this article, in both cases, and whether the acts to be proven are legal or material, imposes the application of the Lebanese law on them.

This is in addition to all that I have indicated in this opinion and in my previous opinion about the specificity and mandatory character of the Lebanese law in this procedural field, and consequently about the reasons that prevent the application of the Discovery process before its courts.

c-For any "material acts", do you agree with Dr. Ghossoub's conclusion that Article 139 "permits the application of the Discovery procedures". If not, why is he wrong?

Dr. Ghossoub considers (p. 12 of his opinion - Arabic version) that Article 139 in its both cases (i.e. the case of the legal acts and the case of the material acts) permits the application of the Discovery process.

In fact, his conclusions regarding the two cases (among which, the case of the material acts) are incorrect for the reason given in the answer to the two sections (a) and (b) of this question.

Therefore, I do not agree with what was stated in Dr. Ghossoub's opinion regarding the applicability of theDiscovery process on the material acts:

Either because it is not permissible to use the Discovery process before the Lebanese court, whatever the type of the act (legal, material) required to be proven.

Or because the evidence to prove the material acts is subject to the law of the judge hearing the dispute.

III-     **At pages 9 to 10 (Arabic at 11-12) of his opinion Dr. Ghossoub asserts that "the Lebanese judge can accept the application of Discovery procedure without any problems as long as the Lebanese judge is not**

8

competent to assess the source of proof of the information presented to him."

"If we consider that the evidentiary procedures will be subject to the law of the judge before whom it is being held, and that the Lebanese judge is the intended party here, then the Lebanese judge can accept the application of Discovery procedure without any problems as long as the Lebanese judge is not competent to assess the source of proof of the information presented to him."

"As for the issue of representation, it is not raised here. It is unreasonable for a Lebanese court to delegate a foreign court to carry out a procedure that does not originally fall within the jurisdiction of the Lebanese judiciary. The Lebanese judge does not have to collect information about the litigants, but the evidence is the task of the litigants, and the role of the judge is limited to receiving this information to take measures based on it."

a- The unspoken premise of this conclusion is that Dr. Ghossoub believes that Lebanese judges are "not competent to assess" the source of the evidence sought. Is that premise consistent with Article 140, which establishes that Lebanese judges may mandate foreign courts to procure foreign evidence?

b- Is Dr. Ghossoub's assertion that "the role of the judge is limited to receiving this information" consistent with Article 140's authorization of judicial mandates to procure foreign evidence?

I have to clarify, at the outset, what Dr. Ghossoub meant in the context of his analysis of the provisions of Article 140 of the Code of Civil Procedure (p. 12 of his opinion - Arabic version). In fact, he considers that:

1- The Acceptance of the Discovery process by the Lebanese judge is possible because this judge is not competent to assess the source of the information presented to him.

9

2- The issue of the judicial mandate is not raised in the current case, as it is not reasonable for a Lebanese court to mandate a foreign court to carry out a procedure outside the jurisdiction of the Lebanese judiciary (which means the territorial jurisdiction) because the procurement of proof is the task of the litigants, while the role of the judge is limited to receiving information to take his decisions based thereon.

Starting from this clarification, I will answer the sections (a) and (b) of the raised question.

    a- The unspoken premise of this conclusion is that Dr. Ghossoub believes that the Lebanese judges are "not competent to assess" the source of the evidence sought. Is that premise consistent with Article 140, which provides that Lebanese judges may mandate foreign courts to procure foreign evidence?

**Dr. Ghossoub presented the matter from an angle that is inconsistent with its reality. The dispute does not revolve around the right of the Lebanese judge to assess the source of the requested evidence. Rather, it revolves around the evidence itself, i.e. theDiscovery that is not acceptable to the Lebanese law procedural system.**

Therefore, Iconsider that the presentation of the matter as done in Dr. Ghossoub's opinion deviates the matter from its true axis. It has nothing to do with the provisions of Article 140.

In view of this reality, it is no longer necessary to approach the matter at hand from the angle of the judicial mandate whose role I will address in section (b) of the answer.

    b- Is Dr. Ghossoub's assertion that "the role of the judge is limited to receiving this information" consistent with Article 140's authorization of judicial mandates to procure foreign evidence?

Contrary to what Dr. Ghossoub says, the role of the Lebanese judge is not limited to receiving the information gathered by the litigants.

10

The last paragraph of Article 140 related to mandating a foreign court to carry out procedures that contribute to facilitating the resolution of the case is the best evidence.

The role of the Lebanese judge goes beyond "receiving" to initiating in many cases stipulated in the Code of Civil Procedure in the field of evidence, including, for example:

- The power given to the court to order on its own initiative to conduct any investigation to complete the evidence invoked by the litigants (Article 135 of the Code of Civil Procedure).
- The power given to the court to have recourse to audio or visual recording (Article 136 of the Code of Civil Procedure).
- The power given to the court to disregard the evidentiary procedures if it deems them ineffective (Article 137 of the Code of Civil Procedure).
- The power given to the court to call on its own initiative the public official who issued the document tainted with annotations or erasure to express his position (Article 170 of the Code of Civil Procedure).
- The power given to the court to order a litigant to produce a paper in his possession (Article 205 of the Code of Civil Procedure).
- The power given to the court to decide on its own initiative to question the litigants (Article 218), or to mandate a foreign court to question them (Article 225).
- The power given to the court to decide on its own initiative to call witnesses for the sake of revealing the truth, in the cases where the law permits having recourse to witnesses (Article 268 of the Code of Civil Procedure).

The jurisprudence has well shed the light on the role of the judge in the matter of evidence.

(See for example: EdouardEid, Encyclopedia of the Code of Procedure, Evidence and Enforcement, Volume Thirteen, Evidence 1).

See in particular:

Therefore, the judge is not restricted to the limits of the evidence presented by the litigants, which is a matter on which jurisprudence unanimously agrees, and his authority in the field of proof is very broad. The Code of Civil Procedure gives him an important authority to

11

automatically decide to conduct any investigation that he deems useful in the event of insufficient evidence provided by the litigants".

(Ibid., No. 46, p. 167).

It follows from all of this that what was stated in the opinion of Dr. Ghossoub as to the judge's role as a "receiver" not an initiator, conflicts with the Lebanese Code of Civil Procedure, and with similar codes of civil procedure prevailing in the Roman-Germanic family.

IV-   **Mr. El Aref opines that Article 140 does not prohibit Lebanese litigants from gathering evidence from a foreign court (see paragraph 8 of his declaration).**

    a. **Does the fact that the judge may mandate a foreign court to procure such evidence implicitly mean that the parties may not do so unless the Lebanese judge delegates that authority to them?**

Lawyer Aref El-Aref, the attorney of the party seeking Discovery, stated in his declaration the following:

"the final sentences of article 140 permits Lebanese courts to request assistance from foreign courts in gathering evidence. It does not prevent Lebanese litigants from gathering evidence in foreign countries without an order from a Lebanese court. There is no provision of Lebanese law that forbids litigants from obtaining discovery in the United States pursuant to Section 1782.

-   The attorney of the party seeking Discoveryhas a sound start to his reading of Article 140 when he indicated that its last paragraph permits mandating a foreign court to carry out evidentiary procedures in the case initiated before the Lebanese court. The text is explicit regarding the mandate issued by the Lebanese court.

However, he soon falls into error when he considers that the text itself does not prevent the Lebanese litigant from gathering evidence from a foreign court without a license or an order from the Lebanese court. He is also mistaken when he says that there is no provision in the

12

Lebanese law that forbids litigants from obtaining Discovery in the United States pursuant to Section 1782.

**This approach to interpreting legal texts - related to the rules of procedure in particular and related to the mandatory rules that must be applied in particular - creates an atmosphere of laxity and chaos in interpretation, and deprives the strictly binding and specific legal provision of its effectiveness.**

**Therefore,**

**It is no longer possible to say that the litigants can gather the evidence from foreign countries without an order from the Lebanese court, because this possibility deprives the judge hearing the dispute of his extensive authority in managing the lawsuit, as I have explained in my previous opinion and in the current opinion.**

It is no longer possible to say that as long as the Lebanese law does not explicitly prohibit resorting to the Discovery process, then it is the right of the litigants to resort to it, because the Lebanese Code of Civil Procedure - like all other similar codes - sets general procedural rules designed to solve the problems arising from particular secondary matters raised on the occasion of a dispute before the courts (as is the case with theDiscovery), which makes the inadmissibility or admissibility of a particular procedure closely and inextricably linked to the general rule. The general rule, in this regard, is Articles 139 and 140, which prohibit, in their meaning and purpose, the use ofDiscovery or other processes that are not compatible with the procedures adopted in the Lebanese law, and rather in the Lebanese legal culture, as is the case with theCross-Examination adopted in the laws belonging to the Anglo-Saxon family upon hearing the witnesses (I will refer to it later on).

Since such processes (Discovery, Cross-examination…) caused controversy in judicial and legal circles in some countries of the Roman-Germanic family, the legislator intervened to put an end to them whenever they were contrary to the public order in particular (for example, the French Law No. 68-678 dated 26/07/1968, as amended by Law No. 538-80dated16/07/1980).

13

It follows from the foregoing that Article 140 of the Code of Civil Procedure permits the Lebanese judge to take, when necessary, a decision to mandate a foreign court to carry out some procedures required by the lawsuit. This is not the only article in this field, because the Code of Civil Procedure includes other rules related to the mandate given by a Lebanese judge to a foreign court (Aforementioned Article 225 of the Code of Civil Procedure).

On the one hand, this mandate that is decided by the Lebanese judge, enhances his authority in managing the case. On the other hand, it aims to take any appropriate measure to fill the lack of measures that contribute to its solution. The law assigned this task to the judge alonenot to the litigants.

V–   **At pages 5 to 6 of his opinion (Arabic at 7) Dr. Ghossoub refers to Articles 203 to 209 of the Civil Procedure Code, and asserts that the use of the 1782 procedure "complements" them.**

**"Hence the Discovery procedure does not violate of the Lebanese general procedural system and the binding national laws of evidence, rather it complements the same."**

**Mr. El-Aref's opinion goes even further, and contends at paragraph 13 that these provisions "empower [] litigants to compel the production of evidence by opponents and third parties without obtaining a court order."**
**a- What do Articles 203 to 209 provide?**
**b- Do these provisions in fact permit litigants to compel the production of evidence by third parties without a court order?**

a-What do articles 203 to 209 provide?

Articles 203 to 209 of the Lebanese Code of Civil Procedure came under the title of evidence, specifically in the second chapter of this title, which deals with the types of evidence in writing (such as the official deed, the ordinary deed, and other papers...), and the types of

14



evidence in writing as well: "Obligating the opponent to produce any conclusive paper in the dispute".

I deem it necessary to shed light on the most important provisions of these articles.

- Article 203 permits any of the parties to the lawsuit to request the judge to obligate the other party that has any conclusive paperin the dispute to produce such paper in cases specified by the same article, which are:

That the law permits the request to produce the said paper (for example, what is stated in Article 21 of the Lebanese Code of Commerce in terms of obligating the merchant to produce his business books).

Or that the paper is common to him and his opponent, i.e. written in their both interest (such as when the two litigants are a party to one contract against another party, and the paper is in the possession of one of these two litigants), or it proves their mutual obligations and rights (such as a sale or a lease contract, the single copy of which is in the possession of one of the two litigants).

Or that his opponent may have relied on it at any stage of the trial (that is, he may have invoked it in his defense without actually presenting it before the court).

- Article 204 details what must be included in the request, such as the description of the paper (a mutual contract or otherwise...), its connection to a specific fact (the occurrence of the sale...), the evidence proving its possession by the litigant (his acknowledgment in another lawsuit that it is in his possession...) and the reason for obligating the opponent to submit it (the fact that it was drafted in favor of both litigants...).

- Article 205 provides what the court will do in the following two cases:

It orders the production of the paper if the litigant acknowledges its existence, or if the plaintiff canprove its existence.

15

It requests the litigant to swear under oath that it does not exist if the plaintiff does not provide sufficient proof. There are also other details that I find useless to mention.

- Article 206 permits the court to consider the statements of the plaintiff if the litigant does not carry out its order related to the production of the paper or if he refrains from taking the oath.

- Article 207 prohibits the litigant from withdrawing a paper that he submitted in the file if the other litigant does not agree to that.

- Article 208 permits the court to:

Involve a third person in the trial in order to compel such person to produce a paper in their possession.

Or take the order to bring papers from the official departments at the request of the litigants or on their own initiative.

- Article 209 gives the court the authority to impose a fine on the person who fails to execute an order issued by the court on the production of a document within a specified period.

- <u>I will conclude this presentation by making the two following observations:</u>

<u>First observation</u>: All the procedures stipulated in the aforementioned Articles 203 to 209 <u>take place in the context of an existing lawsuit between the two litigants, and hence do not take place outside this context</u>. Even Article 208 requires that a third party be included in the trial if the court wants to oblige such third party to produce a paper in their possession.

On the submittal of a request for the production of a paper in an existing lawsuit, refer to:

**"The procedures for submitting a request to oblige the opponent to produce a document in their possession**: These procedures include the submittal of the request and the data that must be mentioned in it, and deciding on the admission or rejection of the request.

16

The law does not require a special form for the aforementioned request. Therefore, it may be submitted by the litigant, <u>during an initial lawsuit, whether in a submission or by a written petition addressed to the court hearing that lawsuit</u>. In my opinion, nothing prevents its submittal also by an oral statement which shall be recorded in the minutes of the hearing."

(Edouard Eid, Encyclopedia of the Code of Procedure, Volume 15, Evidence 2, No. 311, p. 165).

In the French law:

"According to Article 138 of the New Code of Procedure, the production of a document or its delivery by a third party can only be requested "in the course of a proceeding… from the judge hearing the case."

(Henry Solus and Roger Perrot, Private Judicial Law, Sirey-delta, 1991, N.644, p.558)

<u>Second observation:</u> The precise and binding procedures detailed in Articles 203 to 209 have a specificity conferred upon them by the Lebanese law or the similar laws belonging to the Roman-Germanic family, including the French Code of Civil Procedure (Article 11, paragraph 2, and Articles 138 to 142). This specificity appears in the imposed conditions that enable the concerned person to reach their goal, <u>and through which the differences between one system and another</u> (in particular between the Roman-Germanic and Anglo-Saxon systems) appearwith regard to the production of the paper.

See in this regard:

"The differences actually appear about the conditions required to obtain this production."

(HenrySolusand RogerPerrot, Ib., N.644, p.557).

b- Do these provisions in fact permit litigants to compel the production of evidence by third parties without a court order?



17

Articles 203 to 209 of the Lebanese Code of Civil Procedure do not allow any of the litigants to compel third parties to present evidence without obtaining a court order. They are very clear in this respect:

Because, according to what was stated in some of them, the litigant in the lawsuit may request that his opponent be compelled to produce the paper requested to be produced (Article 203). The request is submitted to the court hearing the case.

It is the court that orders the submission of the paper (Article 205).

The court may consider the statements of the person requesting the production of the paper if the other litigant refuses to submit it (Article 206).

The court authorizes the withdrawal of the submitted paper (Article 207).

It compels third parties or official departments to submit the paper (Article 207).

It imposes a fine on those who fail to execute its order (Article 209).

**Based on the foregoing, the opinion of Mr. Al Attabi's lawyer in this regard is incorrect since it contradicts legal texts that are beyond interpretation.**

In my answer to section (a) of this question, I have showed that jurisprudence in Lebanon and France supports my view regarding the active and even mandatory role of the court.

As for what was stated in the opinion of Dr. Abdo Ghossoub that "Discovery procedure does not violate the Lebanese general procedural system and the binding national laws of evidence, rather it complements the same" (p. 6 of his opinion - Arabic version), I consider it inaccurate and incorrect. This is established by:

1- What was detailed in my previous opinion on the matter.

18

2- What will be presented in the present opinion either in answer to specific raised questions or covered in general in the last question No. 8 (such as the matters related to the Unidroit, Estoppel, trust, information companies and service de renseignement bancaire, Central des risques, the denial of ownership formality, the commercial register, and others).

It is to be noted here that Dr. Ghossoub mentioned these legal institutions, mechanisms, organizations or formalities to uphold his opinion that the Anglo-Saxon does not violate the procedural legal public order and the binding laws in Lebanon."

3- What I add in the context of my answer, which is the following:

The notion of public order is closely related to the rules of the codes of civil procedure. If it happens that these rules pertain to the rights of individuals, then this varies from one case to another depending on whether the rules themselves are related or not to an imperative and binding principle.

The use of the Discovery process collides with the public order in its Lebanese sense, even if it is related, in one way, to individual interests. This is because, on the one hand, it is not included and is not acceptable based on Articles 139 and 140 of the Code of Civil Procedure, and on the other hand, it is different in terms of its conditions, in particular, from what was included in Articles 203 to 209 of the same Code... noting that these two categories of Articles (139-140, and 203 to 209) are of the type named Lois de police (public order laws), which are the mass of laws that governs multiple fields (security, economic, environmental, procedural...) and which are intended to be applied exclusively in any of these fields, and which may not be violated, and in all cases because they have immunity, not only at the national level but also internationally:

«Public order laws are internationally mandatory laws otherwise referred to as laws of "immediate application". They are supposed not to suffer any exclusion in international matters. When they belong to the chosen law (or to the law declared applicable (by the arbitrator) in the absence of a choice of the parties), they are imposed naturally.".

(Jean-Baptise Racine, Arbitration Law, Thémis-point Delta, 2016, N. 797, p.507)

19

VI–   At multiple points in his opinion, Dr. Ghossoub draws analogies to various methods of gathering evidence in Lebanon and suggests that they are "similar" to the 1782 procedure in the United States. For example: obtaining information from "information companies" (p. 6; Arabic at 7), exchange of information among banks by a "Service de Renseignement bancaire" (p. 6; Arabic at 7-8)), the Banque du Liban's "Central des risques" (p. 6; Arabic at 8), and the Directorate of Real Estate Affairs (p. 8; Arabic at 10).

   a-   Does the availability of such information have any bearing on the interpretation of Article 139 or Article 140?

A brief overview of the organizations mentioned in this question must be given, including in its context and its conclusion, evidence on the divergence and onthe absence of a relation between the Discovery process and the organizations themselves.

### The Commercial Register

Article 22 of the Lebanese Code of Commerce sets out the dual purpose behind the establishment of the Commercial Register:

On the one hand, it enables the public to gather adequate information about all the commercial establishments operating in the country.

On the other hand, it is a publication tool intended to make its entries enforceable against third parties when the law expressly stipulates this matter.

There is nothing in this dual purpose that aims at forming a general idea on the commercial life in the country or at showing the legal effect of the entries in the Register on third parties in special cases defined by law... It has nothing to do with convergence or mutual influences between the laws of the Roman-Germanic and Anglo-Saxon families.

In particular, it has nothing to do with the procedures accepted in the lawsuit arising before the Lebanese judge.

20

**Banque du Liban's Centrale des risques and the banking information service (service de renseignement bancaire)**

Concerning the Centrale des risques, Article 147 of the Code of Money and Credit in Lebanon (date 01/08/1963) obligated banks to submit to the Banque du Liban periodic data on the credits granted by them, in order for the Centrale des risques authority to operate in a good manner.

In order to implement the provisions of Article 147, the Governor of the Banque du Liban issued Resolution No. 7705 dated 16 October 2000, which aimed to implement the system of the Centrale des Risques, which is an exhaustive system that stipulates that all banks and financial institutions must participate in the centralization of risks, and that they are obligated to provide a statement of the credits granted to the customers, as well as miscellaneous clarifications related to their conditions which are only used to inform the banks and the participating institutions of the total credits granted to the debtor customers.

Concerning the banking information service, Article 6 of the Banking Secrecy Law issued on 03/09/1956 provides that, in order to maintain the investment of their funds, banks may exchange with each other only and under confidentiality the information related to their customers' debit accounts.

These measures set out in the context of Centrale des Risques and in the banking secrecy law, aim to exchange information between banks to protect them from the negative impact that might result from dealing with some debtor customers.

Contrary to what was stated in Dr. Ghossoub's opinion, I do not see any analogy between this and theDiscovery process according to its goal and according to its definition contained in the same opinion (P. 3- Arabic version).

**Information companies**

21

The involvement of information companies in the field of the current conflict does not affect the principle of admissibility or inadmissibility of resorting to the Discovery process as a proof before the Lebanese courts, since these companies have nothing to do with the work of the courts. In addition, in the course of their activities, they must observe the requirements of public order and, consequently, refrain from providing any information that contradicts the public order.

By way of analogy, I recall that Article 5 of the Law on "The Right to Access Information" (applicable in the public sector) dated 10/02/2017 indicated that among the inaccessible documents are those related to "secrets protected by law, such as the professional secret or for example, the trade secret. It is clear that this comparison leads, by way of analogy, to refusing theDiscovery process before the Lebanese courts.

Therefore, talking about the absolute right to "disclose information" becomes unacceptable.

### The Directorate of Real Estate Affairs and the "denial of ownership" formality

Reference was made to an "automated center in the Ministry of Finance" in Article 7 of the Law on "the Acquisition by Non-Lebanese of Real-Estate Rights in Lebanon" dated 04/01/1969. The automated center was established in a period following the issuance of this law and witnessed since 1998 the automation of the Real Estate Register system (check the page of the Directorate General of Real Estate Affairs in the Ministry of Finance, on Google).

The automated center contributes to controlling the real estate ownership on the one hand, and provides stakeholders with information about the real estate properties that are recorded in the Real Estate Register (such as the denial of ownership formality) in preparation for the exercise of some of their rights (such as the precautionary seizure, for example).

Although the public is given the opportunity to inquire about the real estate ownership for a fixed fee (denial of ownership), I do not see any similarity between the function of the automated center and the Discovery process.

### To end the answer to this question, I conclude the following:

22

- Everything contained in Dr. Ghossoub's opinion about applicable organizations in Lebanon differs from the Discovery process, subject of dispute. If these organizations enable the stakeholders to obtain some information subject to observing the public order, they do not justify the adoption of a process that is not in harmony with the binding rules and procedures in Lebanon.

- These organizations and others mentioned in the same opinion, do not affect the proper legal interpretation of Articles 139 and 140 of the Lebanese Code of Civil Procedure.

**VII-** **At pages 7 to 8 of his opinion (Arabic at 8-9), Dr. Ghossoub discusses the purported convergence of Anglo-Saxon and Romano-Germanic legal cultures.**

**a. Does this discussion have any bearing on the interpretation of Articles 139 and 140?**

Despite some convergence (in the recent decades) between the Roman-Germanic and Anglo-American (or Anglo-Saxon) systems, each of these two systems still retains many specificities that distinguish it from the other, and even make it in many cases its opposite:

"Common Law is opposed to the civil law tradition where the main source of law is found in the legal codes" (Common law, Legal system, Wikipedia)

One of the main differences is that the Roman-Germanic family gives great importance to the written legal rule, not only because it provides a predictable solution to the practical issues raised before the judge, but also because it rises to the level of the general behavioral rule under the banner of a precise and integral system (Ghaleb Ghanem, Laws and Regulations throughout History, House of Legal Publications - Sader Publishers, 1991, a special chapter on the Roman-Germanic family, p. 403). As for the Anglo-Saxon family, it still gives its first attention to the court precedents. This is in addition to a difference in the concepts (public law and private law, Equité and Equity...), and in some sources of law, (legislation in the Roman-Germanic family is a main source, and in the Anglo-Saxon family an exceptional source, and court Precedent is a main source in the Anglo-Saxon family while it is not binding in the Roman-Germanic family) and in legal techniques, including those used by judges in interpreting laws (Roman-Germanic family) or in how to apply the rule of case law to new cases (Anglo-Saxon family).

23

(See about this last family: René David, the Major Contemporary Legal Systems, Dalloz, 1969).

All of this is the result of different traditions, cultures, and legal ideals. Hence, it is premature to talk about two similar or complementary systems:

"Despite the dream of some internationalists to create a single law that would be the result of the merger of the two systems, the project is not possible at present. Law is mainly the reflection of a culture, of a tradition. A system where relations develop essentially within a predetermined legal framework is radically opposed to a system where the freedom of the individual reigns and cannot be subjugated to legal obligations except for a major reason."

(Talal Hachem, Dean of the Faculty of Law of USEK (University of the Holy Spirit, Kaslik-Lebanon in the framework of an international colloquium organized by the legal research center of the Faculty of Law, entitled: "the Major Contemporary Legal Systems, at the aforementioned University, 11-12 February 2016).

For example, to emphasize that traditions and temperamentsin the Latin system (the Roman-Germanic family), do not appreciate some of the applicable procedures in the Anglo-Saxon family,I refer to a French jurisprudential position that revolved around the cross-examination procedure where the witnesses are asked questions directly by the attorneys of the two parties to the case, while the judge acts as a "passive arbitrator" whose role is limited to adjudicating objections to questions and removing what is suggestive to the witness from them (Leading questions).

It was stated in this position:

"In our Latin countries, in light of the habits and temperaments, a system like that of"the cross-examination"could hardly be transposed without dangerously compromising the security of justice."

(Henry Solus and Roger Perrot, Private Judicial Law, Court of First Instance, Sirey-Delta, 1991, N. 879, P.746)

24

**For this reason, I do not see any effect of the ideas contained in Dr. Ghossoub's opinion on the correct interpretation of Articles 139 and 140.**

Such an interpretation has a technical, linguistic and objective dimension that must be kept away from the generalities and that confirms its divergence from the wishes related to the openness of the legal systems to each other.

Ultimately, the issue is a matter of differing legal statuses, not a matter of wishes.

**VIII- Are there any other statements in Dr. Ghossoub's declaration that you believe are incorrect or unfounded?**

In addition to all of the foregoing, I find it useful to make some additional observations to shed the light on various matters that Dr. Ghossoub considered as supportive to his opinion on the openness of the Lebanese legal culture to the Anglo-Saxon legal culture, while this consideration is inaccurate.

### 1- On the rules of Unidroit

In order to justify that the Anglo-Saxon Discovery process does not contradict the Lebanese procedural public order and the mandatory Lebanese laws, Dr. Ghossoub points out that attempts are currently being made to unify the procedures on the Arab, European or international levels, which are the procedures known as UNIDROIT (p. 6 of his legal opinion - Arabic version).

This argument is not valid for the following reasons:

- Because these rules are neither complete nor binding, and they are applied in particular, as an aspect of supra-national rules (Lex Mercatoria) prevailing in the field of international trade and international arbitration when the parties agree to them or upon deciding their application by the arbitrators within specific conditions.



(See: Principles of Unidroit for International Trade Contracts, International Arbitration Journal, Beirut, No. 45-46, and P. Fouchard, E. Gaillard and B. Goldman, International Commercial Arbitration, Litec-Delta, 1997, N.1458, p.829).

- Because the jurists belonging to the Common Law themselves criticize Lex Mercatoria for its ambiguous nature.

See in this regard:

"The third type of criticism addressed to the method of the general principles of law arises from the difficulties that one would experience in determining their content with precision. These criticisms are especially prevalent among the authors of the commonlaw tradition. The vagueness of these rules has often been the object of irony, since they are so difficult to define that they seem to be reduced to what the arbitrators decide to determine in each case."

(Fouchard, Gaillard and Goldman, Ib., M.1554. p.823)

- Because it is impossible to have recourse to the rules of the Unidroit in particular or the Lex Mercatoria in general, when these rules collide with the binding national procedures.

**2- On the rule of Estoppel**

In the same way, Dr. Ghossoub believes that Lebanese law is very open to the English legal institutions, including Estoppel (p. 6 of his opinion).

This argument, in turn, is not valid because the Lebanese law has received the rule of "rejecting the contradiction in the position of one of the parties to the conflict to the detriment of the other party" (similar to Estoppel) from the Islamic heritage, and in particular from the universal rules (or the general principles in the Ottoman "Journal of courts judgments", Article 100). The matter is one of convergence, not openness.

(On the roots of this rule, see: Dr. Mahmoud Al Maghrebi, International Arbitration Journal, No. 11, 2011, p. 135, and also: Dr. Raafat Al Mikati, Estoppel: Preventing Contradictions to the Detriment of Others in the Islamic Sharia, International Arbitration Journal, No. 5, 2010, p. 165.)

### 3- On theTrust (or Trust Institutions)

In the same way, Dr. Ghossoub believes that Lebanese law is very open to the English legal institutions, including the Trust process (p. 6 of his opinion).

This argument, in turn, is not valid, because the Trust Institutions (Trust) are considered as:

"A fundamental and unique phenomenon of the English law that is unknown in the Roman-Germanic family laws. The "TrustInstitution" is summarized as a legal system in which one or several persons manage funds belonging to another person or to several persons as well. They are applied in several cases, including the liquidation of estate and the protection of non-discerning persons. The person responsible for the administration is not only a director, but alsoa representative of the beneficiaries."

(Galeb Ghanem, Laws and Regulations throughout History, Chapter entitled: The Anglo-Saxon Family, House of Legal Publications - Sader Publishers, 1991, p. 422, with the reference mentioned in this chapter:

René David and David Pugsley, Contracts in the English law, General libraries of law and case law, Paris 1985, N.&9, p.49)

It is to be noted that the idea of Trust is consistent with the principles of contracts and has nothing to do with the procedures that take place before the courts.

As for the comparison between the Trust and the Endowment (Wakf), it will not lead to many points of convergence, especially since the source of the endowment is the Islamic Sharia, and that it is usually established for the benefit of the poor or in the context of acts of charity (charitable endowment), and may be familial (Zurri-Wakf familial perpetual)and may also be mixed.

27

(On this, see: Bicharah Tabbah, Private property and Real Estate Register, Volume 1, 1947, Pages 389 and seq.)

### 4- On International treaties

The international treaties mentioned by Dr. Ghossoub (p. 9 of his opinion - Arabic version) do not mean that the legal systems are moving towards a merger. They are concerned in particular with the unification of some (particularly objective) rules in the field of international trade.

If the 1980 United Nations treaty (known as the Vienna Treaty) opted not to rely onlyon the principles of the Germanic-Roman family and went beyond them to the Anglo-Saxon family laws, this was due to the desire to secure the affiliation of the United States of America and Britain to it (see in this regard: Talal Hafez Jaber, Contract for the International Sale of Goods, Sader Legal Publishing - Issued in 2007, p. 19). Neither this treaty nor any other would mean that the specificities of the Roman-Germanic and Anglo-Saxon procedural systems have disappeared.

### Concluding Remarks

In conclusion, I would like to emphasize on the following:

First - The refusal by a particular legal system (such as the Lebanese legal system) of an evidentiary procedure before the national courts due to the specificity and the mandatory nature of its rules in this field, does not impair the procedural rules prevailing in another legal system. The difference between the rules of the two systems should be viewed from the standpoint of convenience, not from the standpoint of confrontation.

Second - It is neither useful nor practical to deviate the matter at hand from its real axis, which is closely related to some of the binding procedural rules contained in the Lebanese law (the Code of Civil Procedure in particular).

28

It is neither useful nor accurate, in the same line, to confuse the reality of the matter which is the admissibility or the inadmissibility of the requested procedure from the standpoint of the public order and the attempt to justify this procedure from the standpoint of the freedom of proof, which is no longer relevant if the procedure itself collides with the public order.

Third - The matter at hand (the admissibility or the inadmissibility of the Discovery process before the Lebanese courts) cannot be separated from the broad and even dominant role that the law granted to the Lebanese judge in the field of evidence, a role that makes him an initiator in making decisions in this field rather than a recipient of what is issued by the parties to the case.

This role was granted to him even in the field of the freedom of proof, and it must be borne in mind that Article 254 of the Lebanese Code of Commerce linked the principle of invoking all the means of proof to the decision of the judge hearing the case who decides whether these means are admissible or not.

**I declare under penalty of perjury of the laws of the United States of America that the content of this legal opinion expresses my total conviction in light of the applicable Lebanese laws.**

Executed in Beirut, Lebanon, on the 22nd of December 2021

**Judge Doctor Ghaleb Ghanem** (Signature)
**Honorary First President of the Court of Cassation**

Translator's note: True translation of the enclosed document in Arabic



29

القاضي الدكتور غالِبْ غَانِم

الرئيس الأول لمحكمة التمـييز شرعاً
رئيس مجـلس القـضاء الأعـلى سابقاً
رئيس مجلس شورى الدولة سابقاً

تحكيم – استشارات قانونية

رأي قانوني إضافي

حول مدى قبول الـ Discovery أمام المحاكم اللبنانية

**طالب الرأي:** بنك عوده ش.م.ل.، وكيله المحامي النقيب شكيب قرطباوي.

**الموضوع:** معالجة أسئلة معطوفة على رأي قانوني سابق نظّمتُه حول مدى قبول الـ Discovery في لبنان، ومنطلقة من رأي قانوني منظّم بناء على طلب الجهة طالبة الـ Discovery.

\* \* \*

عطفًا على ما ورد في رأي قانوني سابق كنت قد أبديته بناء على طلب بنك عوده ش.م.ل.،

والتزامًا منّي بمعالجة الأسئلة موضوع الرأي الراهن، المنطلقة من رأي قانوني آخر منظّم بناء على طلب الجهة طالبة الـ Discovery،

فإنّي أجيب على الأسئلة المطروحة بالتتابع، مبديًا ما يأتي:



1

I–    At page 3 of his opinion (Arabic at 3), Dr. Ghoussub states that "a non–merchant party can use all the evidence against the merchant party, pursuant to the principle of 'freedom of proof' evidence in commercial matters, provided that this method does not violate the procedural legal public order and the binding laws in Lebanon."

الأدلة للإستخدام من قبل المدعي (الفنان) ضد المدعى عليه (المصرف) التاجر، وبالتالي فإنّه يمكنكم أن تستخدموا ضد المصرف –التاجر – جميع الادلة المتاحة إذ يمكن لغير التاجر ان يستخدم بوجه التاجر كل الادلة، عملا بمبدأ الاثبات الحر في المواد التجارية، بشرط ألّا تكون هذه الوسيلة مخالفة للنظام العام القانوني الإجرائي والقوانين الالزامية في لبنان.

a.    Does "freedom of proof" apply to the trial of Al–Attabi's claims against Bank Audi in Lebanon?

b.    If so, does "freedom of proof" override the exclusive authority given to the Lebanese judge under Article 140 to mandate a foreign court to carry out the evidentiary procedures needed to rule on a case?

\* \* \*

a–Does "freedom of proof" apply to the trial of Al–Attabi's claims against Bank Audi in Lebanon?

–عندما يكون النقاش دائرًا حول قبول القانون اللبناني أو عدم قبوله اللجوء إلى إجراء من الإجراءات في معرض البحث عن الأدلة (الDiscovery في الحالة الراهنة) يُصبح الكلام على مبدأ الإثبات الحر بدون جدوى، بل يصبح خارجًا عن الموضوع.



2

إنّ مبدأ الإثبات الحرّ في لبنان مشار إليه في المادة 254 من قانون التجارة التي تجيز إثبات العقود التجارية بجميع طرق الإثبات التي يرى القاضي وجوب قبولها، وفي المادة 257 من قانون أصول المحاكمات المدنية التي تجيز الإثبات بشهادة الشهود في المواد التجارية مهما كانت قيمة الدعوى.

**ولكنّ هذا المبدأ الهادف أصلاً إلى تسهيل التعامل في الميدان التجاري يصطدم بالقواعد القانونية والإجرائية الآمرة والملزمة وذات الصلة بالنظام العام. وما تحظره القواعد الملزمة لا يمكن إعادة طرحه من منظار آخر، كمنظار حرّية الإثبات.**

إنّ النظام العام يضع حدّاً لبعض الحرّيات، ومنها حرّية التجارة (التي يلازمها الإثبات الحرّ في القضايا التجاريّة).

يراجع حول أولوية (Primauté) النظام العام:

– « L'ordre public conduit à la restriction de certaines libertés. »

(Guillaune Drago, Rapport annuel 2013 de la Cour de cassation, Paris, sous le titre de : L'Ordre Public, P.91)

–**Ordre Public comme limite aux libertés** : La liberté de se marier, de faire grève… ou encore les libertés de commerce… peuvent ainsi entrer en concurrence avec des règles d'ordre public qui viennent les restreindre. »

(Rapport annuel 2013 de la Cour de cassation Française, Ib., P.429)

إنّ اعتماد هذا المبدأ في القضايا التجارية (قانون التجارة، قانون أصول المحاكمات المدنية) وفي قضايا أخرى حدّدتها المادة 257 أصول محاكمات مدنية (وجود كتابة خالية من التوقيع صادرة عن أحد الفرقاء، الإستحالة المعنوية الناتجة عن العرف في بعض المهن أو عن علاقات القربى، فقدان السند الخطّي لسبب أجنبي لا يد للخصم فيه...) إنّ اعتماده حصل لتوسيع دائرة اللجوء إلى الإثبات نظرًا لطبيعة الواقعة أو العمل المراد إثباتهما (كالتعامل التجاري) أو لظروفهما (كاستحالة الحصول على سند بسبب القرابة...) لا لإباحة ما هو ممنوع اللجوء إليه أصلاً (كاللجوء إلى آليّة الـ Discovery ).



3

–في كلّ حال، إنّ د. غصوب ذاته ذكر في رأيه القانوني (ص3 من النسخة العربية) أنّه يتمّ العمل بمبدأ الإثبات الحرّ في المواد التجارية، "بشرط ألّا تكون هذه الوسيلة مخالفة للنظام العام القانوني الإجرائي والقوانين الإلزامية في لبنان."

ويقتضي ألّا يسهى عن البال، في الصّدد عينه، أنّ المادة 254 من قانون التجارة ربطت مبدأ التذرّع بجميع طرق الإثبات بقرار القاضي الناظر في الدعوى، وهو الذي يقدّر ما إذا كانت هذه الطرق مقبولة أو غير مقبولة.

> b– If so, does "freedom of proof" override the exclusive authority given to
> the Lebanese judge under Article 140 to mandate a foreign court to
> carry out the evidentiary procedures needed to rule on a case?

أكّدنا تحت الجزء (a) من هذا السؤال أنّه يقتضي إقصاء مبدأ الإثبات الحرّ عن المسألة موضوع المعالجة.

على أيّ حال، وبصورةٍ احتياطية واستطرادية، نلفت النظر إلى أنّ ادّعاءات السيد العتابي بمختلف وجوهها بشكل عام، وتذرّعه بمبدأ الإثبات الحرّ بشكل خاص، لا يلغي أيًّا من القواعد الإجرائية التي حدّدتها المادة 140 أصول محاكمات مدنية (كخضوع إجراءات الإثبات لقانون القاضي الذي تتمّ أمامه...) ولا يلغي سلطة القاضي في إنابة محكمة أجنبية إذا رأى ذلك مجديًا في الدعوى.

وننوّه بأنّ إجراءات الإثبات تخضع لقانون القاضي الذي ينظر الدعوى.

حول ذلك يراجع:

"**مسائل اجراءات الاثبات**–ونبادر إلى القول بأنّ هذا النوع الأخير من المسائل، أي مسائل الاجراءات والأوضاع التي تتبع في تقديم الدليل، من المسلّم أنه يخضع لقانون القاضي الذي ينظر الدعوى أو يباشر الاجراء الخاص بالاثبات...



4

فما لم يراع في ذلك كلّه قانون القاضي، فإنّ الاجراء الذي تمّ يقع باطلاً ويترتب على بطلانه بطلان الحكم الذي انبنى عليه."

(د.سليمان مرقص، أصول الإثبات وإجراءاته، الأدلّة المطلقة ،الطبعة الخامسة 1991).

ويراجع أيضاً:

« Enfin, lorsqu'il s'agit de déterminer la force probante des divers moyens de preuve, c'est en principe à la loi du for qu'il convient de se référer, puisque, s'agissant de fixer le crédit que le juge doit accorder à tel ou tel procédé de preuve, cette question intéresse directement l'activité du magistrat. »

(Dalloz, Répertoire de droit Commercial et des sociétés, Tome II, 1957, Preuve, N.118, P.650)

II–   At page 9 of his opinion (Arabic at 11–12), Dr. Ghoussub opines that "Article 139, in both cases of its application [to legal acts and material acts], permits the application of the Discovery procedure as a means of proof."  He bases this conclusion on an assertion that "the legal acts to be proven were established in America" or, that from the perspective of the correspondent banks, "legal acts are material acts for them" and "material acts can be proven by various means."

إذن إن المادة 139 في حالتي تطبيقها، تجيز تطبيق إجراء ال "Discovery" كوسيلة اثبات.

في الحالتين اعلاه أن القانون الأميركي هو الواجب التطبيق لأن الاعمال القانونية المراد اثباتها قد انشئت في أميركا وهي تخضع تاليًا للقانون الأميركي، الذي يحتضن إجراء ال "Discovery"، وفي حال اعتبرنا أن اثار هذه الأعمال القانونية حصلت في لبنان، فالقانون اللبناني يعتبر بالنسبة للغير –وانتم من فئة الغير



5

كونكم لستم اطرافا في الأعمال القانونية المذكورة–ان الأعمال القانونية هي وقائع مادية بالنسبة إليهم،
والأعمال المادية يصح اثباتها بمختلف الوسائل، فأين المانع من اثباتها بواسطة إجراء ال "Discovery"؟!

- a. Do you agree that the evidence sought from the correspondent banks involves any "legal acts"?  If not, why is he wrong?

- b. You have opined in this case that some of the evidence sought from the correspondent banks (the information about Bank Audi's assets) concern "material acts."  Is this also true of the other information sought in the subpoenas (the information about overseas transfers made by other Bank Audi customers, and any communications between Bank Audi and the correspondent banks about the subpoenas)?

- c. For any "material acts," do you agree with Dr. Ghoussub's conclusion that Article 139 "permits the application of the Discovery procedure?"  If not, why is he wrong?

a–Do you agree that the evidence sought from the correspondent banks involves any "legal acts"?  If not, why is he wrong?

–إنّ ما جاء في رأي د. غصّوب حول الأعمال القانونية يختلف عن المقصود "بالأعمال القانونية" المذكورة في قانون أصول المحاكمات المدنية، وفي القوانين اللبنانية على العموم.

وعلى الأقلّ، إنّ ما ورد في الرأي حول ماهيّة هذه الأعمال كان ملتبسًا.

لقد حدّدت المادة 147 من قانون الموجبات والعقود اللبناني العمل القانوني على الشكل التالي:



6

"إنّ العمل القانوني هو الذي يُعمل لإحداث مفاعيل قانونية وعلى الخصوص لإنشاء الموجبات.

وإنّ العمل القانوني المنشئ للموجبات يجوز أن يكون صادرًا عن فريق واحد (كتصريح فريقٍ بمشيئته) أو أن يكون اتفاقاً فيُعبَّر عنه حينئذ بالعقد".

انطلاقًا من هذا التحديد، يكون البيع أو الإيجار أو الوكالة، كما تكون الوصايا أو الهبات... أعمالاً قانونيّة. ويكون العقد بين المصرف والزبون عملاً قانونيًّا.

وفضلًا عمّا جاء في المادة 139 أصول محاكمات مدنية حول الأعمال القانونية، فإنّ المادة 131 من القانون ذاته فرّقت ما بين الواقعة (وهي عمل مادي) والعمل القانوني. فقد جاء فيها:

"الإثبات هو إقامة الدليل أمام القضاء على واقعة أو عمل قانوني...".

كما أنّ المادة 138 من القانون ذاته أخضعت قبول الدليل على الأعمال القانونية للقواعد المعمول بها بتاريخ إنشاء هذه الأعمال، وأخضعت الدليل على الأعمال المادية للقواعد المعمول بها بتاريخ إقامة الدعوى.

**في ضوء ما تمّ عرضه أعلاه حول مفهوم العمل القانوني تكون التحويلات المزعومة المراد إثباتها خارجة عن هذا المفهوم.**

–وبصورة استطرادية، إذا اعتبرنا أنّ التحويلات، فيما لو حصلت، هي أعمال قانونية، فهي تُعدّ أعمالًا مادية بالنسبة إلى الغير (البند 2 من المادة 257 أصول محاكمات مدنية). والدليل على الأعمال المادية، وفق الفقرة الثانية من المادة 139 أصول محاكمات مدنية، يخضع لقانون القاضي الناظر في النزاع، أي للقانون اللبناني في الحالة الراهنة باعتبار أنّ النزاع عالق أمام المحكمة اللبنانية.

–ولا جدوى من القول–كما جاء في رأي د.غصوب (ص11 من النسخة العربية) إنّه يصحّ إثبات هذه الأعمال بمختلف وسائل الإثبات ومن بينها إجراء الـDiscovery لأنّ الخلاف دائر حول مبدأ قبول الـ Discovery أمام القاضي اللبناني لا على وسائل إثبات الأعمال الماديّة.



b– You have opined in this case that some of the evidence sought from the correspondent banks (the information about Bank Audi's assets) concern "material acts." Is this also true of the other information sought in the subpoenas (the information about overseas transfers made by other Bank Audi customers, and any communications between Bank Audi and the correspondent banks about the subpoenas)?

لقد بيّنا، في معرض الجواب على الجزء (a) من هذا السؤال، أنّ التحويلات لمصلحة أشخاص آخرين– في حال حصولها– تُعدّ أعمالاً مادّية بالنسبة إلى طالب ال Discovery. والحلّ ذاته ينطبق على المراسلات بين بنك عوده والمصارف المراسِلة.

وإنّنا لا نشاطر د.غصوب الإستنتاج الذاهب إلى أنّ المادة 139 تجيز تطبيق إجراء ال Discovery، لأنّ هذه المادة، في حالتيها، وسواء كانت الأعمال المطلوب إثباتها قانونية أو مادية، تفرض تطبيق القانون اللبناني عليها.

هذا فضلاً عن كلّ ما أبديناه، في هذا الرأي وفي رأينا السّابق، حول خصوصيّة القانون اللبناني وإلزاميته في هذا المجال الإجرائي، وبالتالي حول الأسباب التي تحول دون تطبيق آليّة ال Discovery أمام محاكمه.

c–For any "material acts", do you agree with dr. Ghousoub's conclusion that article 139 "permit the application pf the Discovery procedures". If not, why is he wrong?

يرى د. غصوب (ص 12 من رأيه–النسخة العربية) أنّ المادة 139 في حالتيها (أي حالة الأعمال القانونية وحالة الأعمال المادية) تجيز تطبيق إجراء ال Discovery.



8

في الواقع، إنّ ما توصّل إليه بشأن الحالتين (ومن بينهما حالة الأعمال المادية) غير صحيح للسبب الوارد في الجواب على القسمين (a) و (b) من هذا السؤال.

إذًا، إنّنا لا نوافق على ما جاء في رأي د. غصوب بالنسبة إلى إمكان تطبيق ال Discovery على الأعمال المادية:

إمّا لعدم جواز الإستعانة بال Discovery أمام المحكمة اللبنانية كائناً ما كان نوع العمل (قانوني، مادي) المطلوب إثباته.

وإمّا لأنّ الدليل على إثبات الأعمال المادية يخضع لقانون القاضي الناظر في النزاع.

III–   At pages 9 to 10 (Arabic at 11–12) of his opinion Dr. Ghoussub
asserts that "the Lebanese judge can accept the application of
Discovery procedure without any problems as long as the
Lebanese judge is not competent to assess the source of proof of
the information presented to him."

اذا اعتبرنا أن اجراءات الاثبات سوف تخضع لقانون القاضي الذي تتم امامه، وإن القاضي اللبناني هو المقصود هنا، فإنّ القاضي اللبناني يمكنه أن يقبل بتطبيق إجراء ال Discovery بدون أي اشكال طالما أن القاضي اللبناني غير مختص لتقييم مصدر اثبات المعلومة المعروضة عليه.

اما موضوع الانابة فليس مطروحاً هنا. إذ لا يعقل أن تنيب محكمة لبنانية محكمة اجنبية لانجاز اجراء لا يدخل اصلاً في اختصاص القضاء اللبناني. فليس على القاضي اللبناني ان يجمع معلومات عن المتقاضين بل ان الاثبات من مهمة الخصوم ويقتصر دور القاضي على تلقي هذه المعلومات لاتخاذ اجراءات بالاستناد اليها.



9

a- The unspoken premise of this conclusion is that Dr.
Ghoussub believes that Lebanese judges are "not
competent to assess" the source of the evidence
sought. Is that premise consistent with Article $140$,
which establishes that Lebanese judges may mandate
foreign courts to procure foreign evidence?

b- Is Dr. Ghoussub's assertion that "the role of the
judge is limited to receiving this information"
consistent with Article $140$'s authorization of judicial
mandates to procure foreign evidence?

–علينا أن نوضح، في البداية، ما قصده د. غصوب في سياق تحليله لما تضمّنته المادة 140 أ.م.م.
(ص12 من رأيه–النسخة العربية). فهو بالفعل يرى ما يلي:

1–قبول ال Disovery من قبل القاضي اللبناني ممكن لأنّ هذا القاضي غير مختصّ بتقييم مصدر
المعلومة المعروضة عليه.

2–موضوع الإنابة القضائية غير مطروح في الحالة الراهنة، إذ ليس معقولًا أن تستنيب محكمة لبنانية
محكمة أجنبية لإتمام إجراء خارج عن اختصاص القضاء اللبناني (وهو يعني الإختصاص المكاني) لأنّ
الإثبات من مهمّة الخصوم بينما يقتصر دور القاضي على تلقّي المعلومات للإستناد إليها في قراراته.

انطلاقًا من هذا التوضيح، نجيب على الجزءين (a) و (b) من السؤال المطروح.



10

a- The unspoken premise of this conclusion is that Dr. Ghoussub believes that Lebanese judges are "not competent to assess" the source of the evidence sought. Is that premise consistent with Article 140, which establishes that Lebanese judges may mandate foreign courts to procure foreign evidence?

إنّ الدكتور غصوب طرح المسألة من زاوية غير منسجمة مع حقيقتها. فالنزاع لا يدور حول حقّ القاضي اللبناني في تقييم مصدر الأدلّة المطلوبة، بل يدور حول الدليل ذاته، أي الـ Discovery الذي لا يستسيغه النظام الإجرائي في القانون اللبناني.

لذلك، نرى أنّ الطرح الوارد في رأي د. غصوب يُبعد الموضوع عن محوره الحقيقي. وهو لا يمتّ إلى ما تضمّنته المادة 140 بأيّ صلة.

أمام هذا الواقع، لا يعود ضرورياً مقاربة المسألة المطروحة من زاوية الإنابة القضائية التي سنشير إلى دورها في الجزء (b) من الجواب.

a- Is Dr. Ghoussub's assertion that "the role of the judge is limited to receiving this information" consistent with Article 140's authorization of judicial mandates to procure foreign evidence?

-خلافاً لما يقوله د. غصوب إنّ دور القاضي اللبناني لا يقتصر على تلقّي المعلومات التي يجمعها المتقاضون.

إنّ الفقرة الأخيرة من المادة 140 المتعلّقة بإنابة محكمة أجنبية لاتخاذ إجراءات تساهم في تسهيل حلّ الدعوى هي خير دليل على ذلك.

وإنّ دور القاضي اللبناني يتجاوز "التلقّي" وصولاً إلى المبادرة في حالات كثيرة نصّ عليها قانون أصول المحاكمات المدنية في مجال الإثبات، ومن ذلك، على سبيل المثال:



11

- السلطة المعطاة للمحكمة في أن تأمر من تلقاء نفسها بإجراء أيّ تحقيق استكمالًا لما تذرّع به الخصوم من الأدلّة (المادة 135 أ.م.م.).

- السلطة المعطاة لها في اللجوء إلى التسجيل الصوتي أو البصري (المادة 136 أ.م.م.).

- السلطة المعطاة لها في العدول عن إجراءات الإثبات إذا رأتها غير مجدية (المادة 137 أ.م.م.).

- السلطة المعطاة لها في أن تدعو من تلقاء نفسها الموظف العام الذي صدر عنه السند المشوب بالتحشية أو المحو لإبداء موقفه (المادة 170 أ.م.م.).

- السلطة المعطاة لها في أمر الخصم بإبراز ورقة موجودة في حيازته (المادة 205 أ.م.م).

- السلطة المعطاة لها في أن تقرّر من تلقاء نفسها استجواب الخصوم (المادة 218)، أو استنابة محكمة أجنبية لاستجوابهم (المادة 225).

- السلطة المعطاة لها في أن تقرّر من تلقاء نفسها استدعاء الشهود إظهارًا للحقيقة، في الأحوال التي يجيز القانون فيها الإستعانة بالشهود (المادة 268 أ.م.م.).

وقد تبسّط الفقه في إلقاء الضوء على دور القاضي في الإثبات.

(راجع مثلاً: ادوار عيد، موسوعة أصول المحاكمات والإثبات والتنفيذ، الجزء الثالث عشر، الإثبات 1).

وراجع خصوصًا:

"ومن ثمّ فإنّ القاضي لا يتقيّد بحدود الأدلّة المقدّمة من الخصوم، وهو أمر يجمع عليه الفقه، وإنّ سلطته في حقل الإثبات هي واسعة جدًّا. فقانون أصول المحاكمات المدنية يخوّله سلطة هامة كي يقرّر تلقائيّاً إجراء أيّ تحقيق يراه مفيدًا في حال عدم كفاية الأدلّة المقدّمة من الخصوم".

(المرجع ذاته، رقم 46، ص 167).

–يستنتج من كلّ ذلك أنّ ما جاء في رأي د. غصوب لجهة دور القاضي "المتلقّي" لا المبادر يتعارض مع قانون أصول المحاكمات المدنية اللبناني، ومع قوانين أصول المحاكمات المدنية المشابهة السائدة في الأسرة الرومانية–الجرمانية.



12

IV– Mr. El Aref opines that Article 140 does not prohibit Lebanese litigants from gathering evidence from a foreign court (see paragraph 8 of his declaration).

a. Does the fact that the judge may mandate a foreign court to procure such evidence implicitly mean that the parties may not do so unless the Lebanese judge delegates that authority to them?

جاء في تصريح المحامي عارف العارف، وكيل طالب ال Discovery، ما يلي:

"the final sentences of article 140 permits Lebanese courts to request assistance from foreign courts in gathering evidence. It does not prevent Lebanese litigants from gathering evidence in foreign countries without an order from a Lebanese court. There is no provision of Lebanese law that forbids litigants from obtaining discovery in the United States pursuant to Section 1782."

–ينطلق وكيل طالب ال Discovery انطلاقة سليمة في قراءته للمادة 140 لدى قوله إنّ فقرتها الأخيرة تسمح بإنابة محكمة أجنبية لاتخاذ إجراءات إثبات في الدعوى الناشئة أمام المحكمة اللبنانية. فالنصّ صريح بخصوص الإنابة التي تصدر عن المحكمة اللبنانية.

ولكنّه ما يلبث أن يقع في الخطأ لدى اعتباره أنّ النّص ذاته لا يمنع المتقاضي اللبناني من جمع الأدلّة من محكمة أجنبية بدون ترخيص أو أمر من المحكمة اللبنانية. ويقع في الخطأ أيضًا حين يقول إنّه ما من نصّ في القانون اللبناني يمنع المتقاضين من الحصول على ال Discovery من الولايات المتحدة الأميركية على أساس الإجراء رقم 1782.

إنّ هذا النّهج في تفسير النصوص القانونيّة، –المتعلّقة بقواعد أصول المحاكمات بصورة خاصّة، والمتعلّقة بالقواعد الملزمة التي لا مفرّ من تطبيقها بصورة أخصّ– يُشيع جوّاً من التفلّت أو الفوضى في التفسير، ويجرّد النّص القانوني الملزم والمحدّد الموضوع بدقّة من فاعليّته.



13

وعليه،

لا يعود ممكنًا القول إن الخصوم يستطيعون جمع الأدلّة من البلدان الأجنبيّة بدون أمر من المحكمة اللبنانية، لأنّ في هذه الإمكانيّة ما يجرّد القاضي الناظر في النزاع من سلطته الواسعة في ادارة الدعوى، وفق ما بيّناه في رأينا السابق وفي الرأي الحالي.

ولا يعود ممكنًا القول إنّه طالما أنّ القانون اللبناني لا يمنع صراحة اللجوء إلى آليّة الـ Discovery فمن حقّ الخصوم اللجوء إليه، لأنّ قانون أصول المحاكمات المدنية اللبناني–على غرار سائر القوانين المشابهة– وضع قواعد إجرائية عامة مُعدّة لحلّ الإشكالات الناتجة عن المسائل الفرعية الخاصّة المطروحة بمناسبة نزاع امام المحاكم(كما هي الحال بالنسبة لـ Discovery)، الأمر الذي يجعل رفض الإجراء الخاص أو قبوله مرتبطًا ارتباطًا وثيقًا وحتميًا بالقاعدة العامة. والقاعدة العامة، في هذا المجال، هي المادتان 139 و140 اللتان تحظّران في مدلولهما وغايتهما اللجوء إلى الـ Discovery أو سواه من الآليّات التي لا تتآلف مع الإجراءات المعتمدة في القانون اللبناني، بل في الثقافة القانونية اللبنانية، كما هي الحال أيضًا مع الـ Cross– Examination المعتمدة في القوانين المنتمية إلى الأسرة الأنكلوساكسونية لدى سماع الشهود (أشرنا إليها في مكان لاحق).

ونظراً لأنّ مثل هذه الآليّات (...Discovery, Cross–examination) أحدثت جدلًا في الأوساط القضائية والقانونية، في بعض بلدان الأسرة الرومانية–الجرمانية، تدخّل المشترع لوضع حدّ له كلّما كانت تعارض النظام العام على الأخصّ (مثال ذلك القانون الفرنسي رقم 68–678 تاريخ 1968/7/26، المعدّل بالقانون رقم 80–538 تاريخ 1980/7/16).

يستنتج ممّا سبق أنّ المادة 140 أصول محاكمات مدنية أجازت للقاضي اللبناني أن يتّخذ، لدى الضرورة، قراراً يقضي بإنابة محكمة أجنبية لاتخاذ بعض الإجراءات التي تستلزمها الدعوى. وليست المادة الوحيدة في هذا المجال لأنّ قانون أصول المحاكمات المدنية تضمّن قواعد أخرى تتعلّق بإنابة القاضي اللبناني محكمة أجنبية (المادة 225 محاكمات مدنية السابقة الذكر).



14

وإنّ هذه الإنابة التي يعود أمر تقريرها للقاضي اللبناني تعزّز سلطته في إدارة الدعوى، من جهة. وترمي إلى اتخاذ أيّ تدبير ملائم يسدّ النقص في الإجراءات المسهمة في حلّها، من جهة أخرى. وقد أولاه القانون وحده –من دون الخصوم– هذه المهمّة.

V-   At pages 5 to 6 of his opinion (Arabic at 7) Dr. Ghoussub refers to Articles 203 to 209 of the Civil Procedure Code, and asserts that use of the 1782 procedure "complements" them.

ما يجعل ال Discovery غير مخالف للنظام العام الإجرائي اللبناني ولقوانين الإثبات الوطنية الالزامية التطبيق، بل مكملًا صحيحًا ومفيدًا لها.

Mr. El-Aref's opinion goes even further, and contents at paragraph 13 that these provisions "empower[] litigants to compel the production of evidence by opponents and third parties without obtaining a court order."

a- What do Articles 203 to 209 provide?

b- Do these provisions in fact permit litigants to compel the production of evidence by third parties without a court order?

a-What do articles 203 to 209 provide?

–وردت المواد 203 إلى 209 في قانون أصول المحاكمات المدنية اللبناني، في باب الإثبات، وتحديدًا في الفصل الثاني من هذا الباب الذي تطرّق إلى أنواع الإثبات بالكتابة (كالسند الرسمي، والسند العادي، وسائر الأوراق...)، ومن أنواع الإثبات بالكتابة أيضًا: "إلزام الخصم بإبراز أية ورقة منتجة في النزاع."



15

ونرى ضروريًا إلقاء الضوء على أبرز ما تضمّنته هذه المواد.

- المادة 203 أجازت لأيّ طرف من أطراف الدعوى الطلب من القاضي إلزام الطرف الآخر الحائز على أيّ ورقة منتجة (concluante) في النزاع بإبراز هذه الورقة في حالات حدّدتها المادة ذاتها، وهي:

أن يجيز القانون المطالبة بإبرازها (مثال ذلك ما ورد في المادة 21 من قانون التجارة اللبناني لجهة إلزام التاجر بإبراز دفاتره التجارية).

أو أن تكون مشتركة بينه وبين خصمه أي محررة لمصلحتهما معاً (كأن يكون الخصمان طرفًا في عقد واحد مقابل طرف آخر، والورقة موجودة بحيازة أحد هذين الخصمين)، أو مثبتة لالتزاماتهما وحقوقهما المتبادلة (كعقد البيع أو الإيجار الموجودة نسخة واحدة عنه بحيازة أحد الخصمين).

أو أن يكون خصمه قد استند إليها في أيّ مرحلة من مراحل المحاكمة (أي أن يكون قد أشار اليها في دفاعه دون أن يقدمها أمام المحكمة فعلًا).

- المادة 204 تفصّل ما يقتضي ما يتضمّنه الطلب، كأوصاف الورقة (عقد متبادل أو سواه...) وارتباطها بواقعة معيّنة (حصول البيع...) والأدلّة التي تثبت حيازتها من قبل الخصم (إقراره في دعوى أخرى بوجودها في متناوله...) وسبب إلزام الخصم بتقديمها (تحريرها لمصلحة الخصمين معاً...)

- والمادة 205 تنصّ على ما ستفعله المحكمة في الحالتين الآتيتين:

فهي تأمر بإبراز الورقة إذا أقرّ الخصم بوجودها، أو إذا استطاع المستدعي (Le requéreur) إثبات وجودها.

وهي تطلب من الخصم حلف اليمين حول عدم وجودها إذا لم يقدّم المستدعي إثباتًا كافيًا. مع تفاصيل أخرى لا نرى فائدة في ذكرها.

- والمادة 206 تجيز للمحكمة الأخذ بأقوال المستدعي إذا لم ينفذ الخصم أمرها المتعلّق بإبراز الورقة أو إذا امتنع عن حلف اليمين.

- والمادة 207 تمنع على الخصم سحب ورقة قدّمها في الملف إذا لم يوافق الخصم الآخر على ذلك.

16



- والمادة 208 تجيز للمحكمة :

إدخال شخص ثالث في المحاكمة لأجل إلزامه بإبراز ورقة موجودة في حوزته.

أو اتخاذ الأمر بجلب أوراق من الدوائر الرسميّة بناء على طلب الخصوم أو بمبادرةٍ منها.

- والمادة 209 تعطي المحكمة السلطة في فرض غرامة على المتخلّف عن تنفيذ أمر صادر عنها متعلّق بإبراز مستند في مهلة محدّدة.

– في ختام هذا العرض لا بدّ من إبداء الملاحظتين الآتيتين:

الملاحظة الأولى: إنّ كل الإجراءات التي نصّت عليها المواد 203 إلى 209 السابقة الذكر يتمّ في معرض دعوى قائمة بين الخصمين، ولا يتمّ إذاً خارج هذا الإطار. حتّى أنّ المادة 208 توجب إدخال الغير في المحاكمة إذا شاءت المحكمة إلزامه بإبراز ورقة موجودة في حوزته.

حول أنّ طلب إبراز الورقة يتمّ في معرض دعوى قائمة، يراجع:

"إجراءات طلب إلزام الخصم بتقديم مستند موجود تحت يده: تشمل هذه الإجراءات تقديم الطلب والبيانات التي يجب أن تذكر فيه، وتقرير قبول الطلب أو رفضه.

ولا يشترط القانون صيغة خاصة للطلب المذكور. ولذا يجوز تقديمه من الخصم، في أثناء دعوى أصلية، بلائحة أو باستدعاء مكتوب يوجه إلى المحكمة الناظرة في تلك الدعوى. وليس ما يمنع، برأينا، تقديمه أيضاً بموجب تصريح شفهي يجري إثباته في محضر الجلسة."

(ادوار عيد، موسوعة أصول المحاكمات، الجزء الخامس عشر، الإثبات 2، رقم 311، ص165).

وفي القانون الفرنسي:

« Aux termes de l'art. 138 nouv. C. pr. La production d'une pièce ou sa remise par un tiers ne peut être demandée que « dans le cours d'une instance… au juge saisi de l'affaire. »

(Henry Solus et Roger Perrot, Droit judiciaire privé, Sirey-delta, 1991, N.644, P.558)

17



الملاحظة الثانية: إنّ الإجراءات الدقيقة الملزمة التي فصّلتها المواد 203 إلى 209 تتمتّع بخصوصيّة أضفاها عليها القانون اللبناني أو القوانين الشبيهة المنتمية إلى الأسرة الرومانية–الجرمانية ومنها قانون أصول المحاكمات المدنية الفرنسي (المادة 11 فقرة 2 والمواد 138 إلى 142). وإنّ هذه الخصوصيّة تظهر في الشروط المفروضة التي تمكّن صاحب العلاقة من الوصول إلى غرضه، والتي تتبلور عبرها الفوارق بين نظام وآخر (وبصورة خاصّة بين النظامين الروماني–الجرماني والأنكلوساكسوني) فيما خصّ إبراز الورقة.

يُراجع بهذا الخصوص:

« Les divergences apparaissent en réalité au sujet des conditions requises pour obtenir cette production. »

(Henry Solus et Roger Perrot, Ib., N.644, P.557).

b– Do these provisions in fact permit litigants to compel the production of evidence by third parties without a court order?

–لا تسمح المواد 203 إلى 209 من قانون أصول المحاكمات المدنية اللبناني لأيَ من الخصوم إلزام الغير بتقديم الأدلّة من دون الحصول على أمر من المحكمة. فهي شديدة الوضوح لهذه الجهة:

لأنّه، وفق ما جاء في بعضها، يجوز للخصم في الدعوى أن يطلب إلزام خصمه بإبراز الورقة المطلوب إبرازها (المادة 203). والطلب يُقدّم إلى المحكمة الناظرة في الدعوى.

والمحكمة هي التي تأمر بتقديم الورقة (المادة 205).

والمحكمة قد تأخذ بأقوال طالب إبراز الورقة إذا امتنع الخصم الآخر عن تقديمها (المادة 206).

والمحكمة تأذن بسحب الورقة المقدّمة (المادة 207).

وهي تلزم الغير أو الدوائر الرسمية بتقديم الورقة (المادة 207).

وهي التي تحكم بالغرامة على من يتخلّف عن تنفيذ أمرها (المادة 209).



18

بناءً على ما سبق، يكون رأي محامي السيد العتّابي بهذا الخصوص غير صحيح لتعارضه مع نصوص قانونية لا تقبل التأويل.

وقد بيّنا لدى الجواب على القسم (a) من هذا السؤال أنّ الفقه في لبنان وفرنسا يؤيّد ما نذهب إليه لجهة دور المحكمة الإيجابي بل الإلزامي.

-أمّا بخصوص ما جاء في رأي د. عبدو غصوب حول أنّ ال Discovery غير مخالف للنظام العام الإجرائي ولقوانين الإثبات الوطنية الإلزامية التطبيق بل إنّه مكمل صحيح ومفيد لها" (ص6 من رأيه-النسخة العربية)، فإنّنا نعتبره غير دقيق وغير صحيح. يُثبّت ذلك:

1-ما ورد مفصّلًا في الرأي السابق الذي أبديناه حول الموضوع.

2-ما سيرد في معرض الرأي الراهن إمّا جوابًا على أسئلة محدّدة مطروحة وإمّا مشمولة بشكل عام في السؤال الأخير رقم 8 (كالمسائل المتعلّقة بال Unidroit، وال Estoppel وال trust، وشركات المعلومات و service de renseignement bancaire، و Central des risques، ومعاملة نفي الملكية، والسجلّ التجاري، وسواها).

هذا مع العلم بأنّ د.غصوب ذكر هذه المؤسسات القانونية أو الآليّات أو التنظيمات أو المعاملات لتعزيز رأيه الذاهب إلى أنّ إجراء ال Discovery الأنكلوساكسوني لا يتعارض مع النظام العام الإجرائي والقوانين الإلزامية في لبنان.

3- ما نُضيفه في سياق جوابنا، وهو التالي:

إنّ فكرة النظام العام تتّصل بقواعد قوانين المحاكمات المدنية اتّصالًا وثيقًا. وإذا حصل أنّ هذه القواعد تتعلّق بحقوق الأفراد، فإنّ ذلك يختلف بين حالة وأخرى تبعاً لارتباط القواعد ذاتها بمبدأ آمر وملزم أو بعدم ارتباطها به.

وإنّ الإستعانة بال Discovery يصطدم بالنظام العام بمفهومه اللبناني، حتى ولو كان متّصلًا، في وجه من وجوهه، بالمصالح الفرديّة. ذلك أنّه، من جهة، غير مشمول ولا مقبول استناداً إلى المادتين 139 و 140 أصول محاكمات مدنية، ومن جهة ثانية، مختلف لجهة شروطه على الأخصّ، عمّا تضمّنته المواد 203 إلى 209 من القانون ذاته... علمًا بأنّ هاتين الفئتين من المواد (140-139، و 203 إلى 209) تعتبر من النوع

19



المسمّى Lois de police، والمقصود بها كتلة القوانين التي ترعى حقولًا متعدّدة (أمنية، إقتصادية، بيئية،

إجرائية...) والمعدّة للتطبيق في أيّ حقل من هذه الحقول دون سواها، والتي لا تجوز مخالفتها، وفي كلّ

الأحوال لأنّها تتمتّع بحصانة، لا على الصعيد الوطني وحسب، بل على الصعيد الدولي أيضًا:

« Les lois de police sont des lois internationalement impératives autrement
dénommées lois « d'application immédiate ». Elles sont censées ne souffrir aucune
exclusion en matière internationale. Lorsqu'elles appartiennent à la loi choisie (ou
à la loi déclarée applicable (par l'arbitre) en l'absence de choix des parties), elles
s'imposent naturellement. »

(Jean-Baptise Racine, Droit de l'arbitrage, Thémis-point Delta, 2016, N.797. P.507)

VI–   At multiple points in his opinion, Dr. Ghoussub draws analogies to
various methods of gathering evidence in Lebanon and suggests that
they are "similar" to the 1782 procedure in the United States.  For
example: obtaining information from "information companies" (p. 6;
Arabic at 7), exchange of information among banks by a "Service de
Renseignement bancaire" (p. 6; Arabic at 7-8)), the Banque du
Liban's "Central des risques" (p. 6; Arabic at 8), and the Directorate
of Real Estate Affairs (p. 8; Arabic at 10).

a– Does the availability of such information have any bearing on the
interpretation of Article 139 or Article 140?

لا بدّ من إعطاء لمحة مقتضبة عن التنظيمات المذكورة في هذا السؤال، تتضمّن في سياقها، وفي خاتمتها،

ما يدلّ على التباعد وعلى انعدام العلاقة بين آليّة الـ Discovery وبين التنظيمات ذاتها.

<u>السجل التجاري</u>

حدّدت المادة 22 من قانون التجارة اللبناني الهدف المزدوج الكامن وراء إنشاء السجل التجاري:



20

فهو، من جهة، يمكّن الجمهور من جمع المعلومات الوافية عن كلّ المؤسسات التجارية التي تشتغل في البلاد.

ومن جهة ثانية، هو أداة للنشر يقصد بها جعل مندرجاته نافذة في حق الغير عندما ينصّ القانون صراحة على هذا الأمر.

وليس في هذا الهدف المزدوج الرامي إلى تكوين فكرة إجمالية عن الحياة التجارية في البلد أو إلى بيان الأثر القانوني لمندرجات السجلّ على الغير في حالات خاصة حدّدها القانون... ليس لذلك أيّ علاقة بتقارب أو بتأثيرات متبادلة بين قوانين الأسرتين الرومانية–الجرمانية والأنكلوساكسونية.

وليس له، بصورة خاصّة، أيّ علاقة بالإجراءات المقبولة في الدعوى الناشئة أمام القاضي اللبناني.

### مركزية المخاطر في مصرف لبنان، وخدمة المعلومات المصرفية

بشأن مركزية المخاطر، إنّ المادة 147 من قانون النقد والتسليف في لبنان (تاريخ 1963/8/1) ألزمت المصارف بأن تقدّم إلى مصرف لبنان بيانات دورية عن الإعتمادات الممنوحة من قبلها وذلك في سبيل سير المصلحة المركزية للمخاطر سيرًا حسناً لديه.

وفي سبيل تفعيل نصّ المادة 147 صدر عن حاكم مصرف لبنان القرار رقم 7705 تاريخ 2000/10/16 الذي رمى إلى وضع نظام المصلحة المركزية للمخاطر (Central des risques) موضع التنفيذ، وهو نظام مفصّل نصّ على وجوب اشتراك جميع المصارف والمؤسسات المالية في مركزية المخاطر، وعلى إلزامها بتقديم بيان بالاعتمادات الممنوحة للزبائن، فضلاً عن إيضاحات متفرّقة تتعلّق بأوضاعهم، وهي لا تستعمل إلّا لإعلام المصارف والمؤسسات المشتركة عن مجمل الاعتمادات الممنوحة إلى الزبائن المدينين.

وبشأن خدمة المعلومات المصرفية، نصّت المادة 6 من قانون سريّة المصارف الصادر بتاريخ 1956/9/3 على أنّه يجوز للمصارف في سبيل صيانة توظيف أموالها أن تتبادل فيما بينها فقط وتحت طابع السريّة المعلومات المتعلّقة بحسابات زبائنها المدينة.



21

إنّ هذه التدابير الملحوظة في إطار مركزية المخاطر وفي قانون السريّة المصرفية تهدف إلى تبادل المعلومات بين المصارف لحمايتها من الأثر السلبي الذي قد يخلّفه التعامل مع بعض الزبائن المدينين.

وخلافاً لما ورد في رأي د. غصوب، لا نرى أيّ شبه بينها وبين ال Discovery وفق هدفه ووفق تعريفه الوارد في الرأي ذاته (ص3–النسخة العربية).

<u>شركات المعلومات</u>

إنّ إقحام شركات المعلومات في ميدان النزاع الراهن لا يؤثّر على مبدأ جواز أو عدم جواز اللجوء إلى ال Discovery كدليل إثبات أمام المحاكم اللبنانية، <u>إذ لا علاقة لهذه الشركات بعمل المحاكم</u>. فضلاً عن أنّه عليها، في إطار ممارسة عملها، مراعاة مقتضيات النظام العام والإمتناع بالتالي عن تقديم أيّ معلومة تتعارض معه.

وعلى سبيل القياس، نذكر أنّ المادة 5 من قانون "الحق في الوصول إلى المعلومات" (المعمول به في القطاع العام) تاريخ 2017/2/10 أشارت إلى أنّه من بين المستندات غير القابلة للإطّلاع <u>تلك المتعلّقة بـ</u> <u>"الأسرار التي يحميها القانون كالسرّ المهني أو السرّ التجاري مثلاً"</u>. ومن الجليّ أنّ هذه المقارنة تدفع، على سبيل القياس، إلى عدم قبول ال Discovery أمام المحاكم اللبنانية.

لذلك يصبح الكلام على الحقّ المطلق "بإفشاء المعلومات" كلامًا مرفوضاً.

<u>مديرية الشؤون العقارية ومعاملة "نفي الملكية"</u>

وردت الإشارة إلى "مركز آلي في وزارة الماليّة" في المادة 7 من قانون "اكتساب غير اللبنانيين الحقوق العينيّة العقارية في لبنان" تاريخ 1969/1/4. وقد أُنشئ المركز الآلي في فترةٍ تلت صدور هذا القانون وشهدت منذ العام 1998 مكننة نظام السجل العقاري (تراجع الصفحة الخاصة بالمديرية العامة للشؤون العقارية في وزارة المالية، في Google).



22

إنّ المركز الآلي يسهم في ضبط الملكية العقارية من جهة، ويمدّ أصحاب العلاقة بالمعلومات حول العقارات المدوّنة في السّجل العقاري (ومن قبيل ذلك معاملة نفي الملكيّة) تمهيدًا لممارسة بعض حقوقهم (كالحجز الاحتياطي مثلًا).

وبالرغم من إتاحة الفرصة أمام الجمهور للإستعلام عن الملكية العقارية لقاء رسم محدّد (نفي الملكية) لا نرى أيّ تشابه بين وظيفة المركز الآلي وال Discovery.

<u>في خاتمة الجواب على هذا السؤال نخلُص إلى ما يلي:</u>

- إنّ كل ما تضمّنه رأي د. غصوب حول تنظيمات معمول بها في لبنان يختلف عن آليّة ال Discovery موضوع النزاع. وإذا كانت هذه التنظيمات تمكّن أصحاب العلاقة من إستقاء بعض المعلومات في إطار مراعاة النظام العام، فهي لا تبرّر اعتماد آلية لا تتآلف مع القواعد والإجراءات الملزمة في لبنان.

- إنّ هذه التنظيمات، وسواها ممّا ذكر في الرأي ذاته، لا تؤثّر على التفسير القانوني السّليم للمادتين 139 و 140 من قانون أصول المحاكمات المدنيّة اللبنانية.

VII- At pages 7 to 8 of his opinion (Arabic at 8–9), Dr. Ghoussub discusses the purported convergence of Anglo-Saxon and Romano-Germanic legal cultures.

1. Does this discussion have any bearing on the interpretation of Articles 139 and 140?

-بالرغم من بعض التقارب (في العقود الأخيرة –les dernières décennies) بين النظامين الروماني– الجرماني والأنكلو –أميركي (أو الأنكلوساكسوني)، لا يزال كلّ من هذين النظامين يحتفظ بخصوصيّات كثيرة تميّزه عن الآخر، بل تجعله في حالات كثيرة نقيضًا له:



23

« La common Law s'oppose à la tradition civiliste (civil law) où la principale source du droit se trouve dans les codes juridiques (Common law, Système juridique, Wikipédia)

من وجوه الإختلاف الأساسية أنّ الأسرة الرومانية–الجرمانية تولي القاعدة القانونية المكتوبة اهتمامًا كبيرًا لا لأنّها تقدّم حلاً متوقعًا للمسائل العملية المطروحة على القاضي وحسب، بل لأنّها ترتفع إلى مستوى القاعدة السلوكية العامة المنضوية تحت لواء نظام دقيق ومتكامل (غالب غانم، القوانين والنظم عبر التاريخ، دار المنشورات الحقوقية–مطبعة صادر، 1991، فصل خاص عن الأسرة الرومانية–الجرمانية، ص 403). أمّا الأسرة الانكلوساكسونية فهي لا تزال تولي تولي السوابق القضائية (Precedent) اهتمامها الأول. هذا فضلاً عن اختلاف في المفاهيم (قانون عام وقانون خاص، Équité و Equity...)، وفي بعض مصادر القانون، (التشريع في الأسرة الرومانية–الجرمانية مصدر أصلي، وفي الأسرة الأنكلوساكسونية مصدر استثنائي، والإجتهاد Precedent مصدر أصلي في الأسرة الانكلوساكسونية في حين أنّه غير ملزم في الأسرة الرومانية– الجرمانية) وفي التقنيات القانونية ومنها تلك التي يستعملها القضاة في تفسير القوانين (الأسرة الرومانية– الجرمانية) أو في كيفيّة تطبيق القاعدة الإجتهادية على حالات واقعيّة جديدة(الأسرة الأنكلوساكسونيّة).

(يراجع حول هذه الأسرة الأخيرة: René David, les Grands systèmes de droit comtemporain, Dalloz, 1969).

وكلّ ذلك ناتج عن اختلاف التقاليد، والثقافة، والمُثُل القانونية. من هنا أنّ الكلام على نظامين متشابهين أو متكاملين سابق لأوانه:

« Malgré le rêve de certains internationalistes de créer un droit unique, fruit de la fusion des deux systèmes, le projet n'est point envisageable à l'heure actuelle. Le droit est principalement le reflet d'une culture, d'une tradition. Un système où les relations se développent essentiellement au sein d'un cadre légal prédéterminé s'oppose radicalement à un système où la liberté de l'individu règne et ne saurait être asservie à des obligations légales sauf raison majeure. »

(Talal Hachem, Doyen de la Faculté de droit de l'USEK (Université du Saint-Esprit, Kaslik-Liban dans le cadre d'un colloque international organisé par le centre de recherche juridique de la faculté de droit, intitulé : les grands systèmes juridiques contemporains, à l'université sus-mentionnée, 11-12 février 2016).



24

وعلى سبيل المثال، وللتأكيد على أنّ التقاليد والأمزجة (Tempéraments) في النظام اللاتيني (الأسرة الرومانية–الجرمانية) لا تستسيغ بعض الإجراءات المعمول بها في الأسرة الأنكلوساكسونية، نشير إلى موقف فقهي فرنسي دار حول إجراء (Cross–examination) حيث يتم طرح الأسئلة على الشهود مباشرة من قبل وكيلي الطرفين في الدعوى، في حين أن القاضي يكون بمثابة "محكّم سلبي" ( Arbitre passif) يقتصر دوره على الفصل في الاعتراضات على الأسئلة وإبعاد ما هو موحٍ للشاهد منها (Questions tendancieuses).

جاء في هذا الموقف:

« Dans nos pays latins, Compte tenu des habitudes et des tempéraments, un système comme celui de la « cross–examination » pourrait difficilement être transposé sans compromettre dangereusement la sécurité de la justice. »

(Henry Solus et Roger Perrot, Droit judiciaire privé, Procédure de première instance, Sirey–Delta, 1991, N,879, P.746)

لأجل ذلك، لا نرى أيّ تأثير للأفكار الواردة في رأي د. غصوب على التفسير الصحيح للمادتين 139 و 140.

وإنّ لمثل هذا التفسير بعداً تقنيّاً ولغويّاً وموضوعيّاً يستوجب إبعاده عن العموميّات ويؤكّد اختلافه عن التمنيّات المتعلّقة بانفتاح الأنظمة القانونية بعضًا على بعض.

المسألة في نهاية المطاف، هي مسألة أوضاع قانونية متباينة، لا مسألة تمنيّات.

## VIII– Are there any other statements in Dr. Ghoussub's declaration that you believe are incorrect or unfounded?

فضلًا عن كلّ ما سبق، أرى مفيدًا إبداء بعض الملاحظات الإضافية لإلقاء الضوء على مسائل مختلفة اعتبرها د. غصوب مؤيّدة لرأيه في انفتاح الثقافة القانونية اللبنانية على الثقافة القانونية الأنكلوساكسونية، في حين أنّ هذا الاعتبار غير دقيق.



25

1-حول قواعد الـ **Unidroit**

في سبيل تبرير عدم تعارض إجراء الـ Discovery الانكلوساكسوني مع النظام العام الإجرائي اللبناني والقوانين اللبنانية الإلزامية، يُشير الدكتور غصوب إلى أنّه تجري حاليًا محاولات لتوحيد الإجراءات على الصعيد العربي أو الأوروبي أو العالميّ، وهي الإجراءات المعروفة بالـ UNIDROIT (ص 6 من رأيه القانوني-النسخة العربيّة).

إنّ هذه الحجّة لا تستقيم، للأسباب التالية:

• لأنّ هذه القواعد غير مكتملة، ولا ملزمة، وهي تطبّق على الأخصّ، كوجه من وجوه القواعد الفوق-وطنيّة(Lex Mercatoria) السائدة في ميدان التجارة الدولية والتحكيم الدولي لدى توافق الأطراف عليها أو لدى تقرير تطبيقها من قبل المحكمين ضمن شروط محدّدة.

(راجع: مبادئ Unidroit لعقود التجارة الدولية، مجلة التحكيم العالمية، بيروت، العدد 45-46، و: ,P. Fouchard
E. Gaillard et B.Goldman, Traité de l'arbitrage commercial international, Litec-Delta, 1997,
.(N.1458, P.829

• لأنّ القانونيين المنتمين إلى الـ Common Law أنفسهم يتعرّضون لـ Lex Mercatoria بالإنتقاد بسبب طابعها الغامض.

يراجع بهذا الخصوص:

« Le Troisième type de critiques adressées à la méthode des principes généraux du droit tient aux difficultés que l'on éprouverait à déterminer avec précision leur contenu. Ces critiques sont spécialement répandues chez les auteurs de tradition de common law. On a souvent ironisé sur le caractère vague de ces règles, si délicates à définir qu'elles semblent se réduire à ce que les arbitres décident d'y trouver à l'occasion de chaque affaire. »

(Fouchard, Gaillard et Goldman, Ib., M.1554. P.823)



26

- لأنّه لا مجال للّجوء إلى قواعد ال Unidroit بوجه خاص أو ال Lex Mercatoria بوجه عام لدى اصطدام هذه القواعد بالإجراءات الوطنية الملزمة.

### 2-حول قاعدة ال Estoppel

وفي السبيل ذاته، يرى الدكتور غصوب أنّ القانون اللبناني منفتح جدّاً على المؤسسات القانونية الإنكليزية، ومنها ال Estoppel (ص6 من رأيه).

إنّ هذه الحجّة لا تستقيم بدورها لأنّ القانون اللبناني تلقّى قاعدة "رفض التناقض في موقف طرف من أطراف النزاع إضراراً بالطرف الآخر " (المشابهة لـ Estoppel) عن التراث الإسلامي، وتحديذًا عن القواعد الكليّة (أو المبادئ العامة في "مجلّة الأحكام العدليّة" العثمانية، المادة 100). **فالمسألة هي مسألة تلاقٍ لا انفتاح.**

(حول جذور هذه القاعدة يراجع: د. محمود المغربي، مجلّة التحكيم العالمية، العدد 11، 2011، ص 135، وأيضاً: د. رأفت الميقاتي، Estoppel: منع التناقض إضراراً بالغير في الشريعة الإسلاميّة، مجلّة التحكيم العالمية، العدد 5، 2010، ص165).

### 3-حول ال Trust (أو مؤسسات الأمانة)

وفي السبيل ذاته يرى د.غصوب أنّ القانون اللبناني منفتح جدّاً على المؤسسات القانونية الإنكليزية ومنها إجراء ال Trust (ص6 من رأيه).

إنّ هذه الحجة لا تستقيم بدورها لأنّ مؤسسات الأمانة (Trust) تعتبر:

"ظاهرة جوهرية وفريدة من ظاهرات القانون الانكليزي، غير معروفة في قوانين الأسرة الرومانية–الجرمانية. وتلخّص "مؤسسة الامانة" بأنها نظام قانوني يتولّى فيه شخص أو عدة أشخاص إدارة أموال عائدة لشخص آخر أو لعدة أشخاص أيضًا. يُعمل بها في حالات عديدة، منها تصفية التركات وحماية الاشخاص غير المميّزين. ولا يكون المسؤول عن الادارة مديرًا وحسب، بل هو ممثل للمنتفعين."

(غالب غانم، القوانين والنظم عبر التاريخ، فصل بعنوان: الأسرة الائلكوساكسونية، دار المنشورات الحقوقية–مطبعة صادر، 1991، ص 422، مع المرجع المذكور في هذا الفصل وهو:

René David et David Pugsley, Les Contrats en droit anglais, Librairies générale de droit et de jurisprudence, Paris 1985, N.&9, P.49)



27

هذا مع الإشارة إلى أنّ فكرة ال Trust تتوافق مع مبادئ العقود ولا علاقة لها بالإجراءات التي تتمّ أمام المحاكم.

أمّا المقارنة بين ال Trust وال الوقف (Wakf) فلن تأتي بنقاط التقاء كثيرة خصوصًا وأن مصدر الوقف هو الشريعة الإسلامية، وأنّه ينشأ عادة لصالح الفقراء أو في إطار أعمال الإحسان (وقف خيري)، وقد يكون ذريّاً (Zurri-Wakf familial prepétuel) كما قد يكون مختلطًا (Mixte).

(حول ذلك، يراجع: Bicharah Tabbah, Propriété privée et registre foncier, Tome premier, 1947,
(Pages 389 et s.

## 4- حول المعاهدات الدوليّة

إنّ المعاهدات الدوليّة التي يذكرها د.غصوب (ص9 من رأيه-النسخة العربية) لا تعني سير الأنظمة القانونية نحو الإندماج، وهي تهتم على الأخصّ بتوحيد بعض القواعد (الموضوعية على الأخصّ) في مجال التجارة الدولية.

وإنّه إذا كانت معاهدة الأمم المتحدة للعام 1980 (المعروفة بمعاهدة فيينا) قد آثرت عدم الإعتماد على مبادئ الأسرة-الرومانية الجرمانية فقط وتعدّتها إلى قوانين الأسرة الأنكلوساكسونية فمردّ ذلك إلى تأمين انتساب الولايات المتحدة الأميركية وبريطانيا إليها (راجع بهذا الخصوص: طلال حافظ جابر، عقد البيع الدولي للبضائع، المنشورات الحقوقية-صادر 2007،ص19). ولا تعني هذه المعاهدة أو سواها، أنّ خصوصيات النظامين الإجرائيين الروماني-الجرماني والأنكلوساكسوني قد زالت.

## ملاحظات ختاميّة

نرى في الختام، التأكيد على ما يلي:

أوّلاً-ليس في رفض منظومة قانونية معيّنة (كالمنظومة القانونية اللبنانية) إجراء من إجراءات الإثبات أمام المحاكم الوطنيّة نظرًا لخصوصيّة قواعدها وإلزاميتها في هذا المجال ما يُسيء إلى القواعد الإجرائية السّائدة لدى منظومة قانونية أخرى. وإنّ التباين بين قواعد المنظومتين ينبغي أن يُنظر إليه من زاوية الملاءمة لا من زاوية المواجهة.



28

ثانيًا – ليس مجديًا ولا عمليًا إبعاد المسألة المطروحة عن محورها الحقيقي، الوثيق الصلة ببعض القواعد الإجرائية الملزمة الواردة في القانون اللبناني (قانون أصول المحاكمات المدنية على الأخصّ).

وليس مجديًا ولا دقيقًا، في الخطّ ذاته، الخلط بين حقيقة المسألة المتمثّلة بقبول أو رفض الإجراء المطلوب من زاوية النظام العام وبين محاولة تبرير هذا الإجراء من زاوية الإثبات الحرّ الذي لا يعود البحث فيه وارداً إذا اصطدم الإجراء ذاته بالنظام العام.

ثالثًا – لا يمكن فصل المسألة المطروحة (قبول أو عدم قبول الـ Discovery أمام القضاء اللبناني) عن الدور الواسع بل المهيمن الذي منحه القانون للقاضي اللبناني في حقل الإثبات، وهو دور يجعله مبادرًا في اتخاذ القرارات في هذا الحقل أكثر من كونه متلقّياً ما يصدر عن فرقاء الدعوى.

وقد تمّ منحه هذا الدور حتّى في حقل الإثبات الحرّ، ويقتضي ألّا يسهى عن البال أنّ المادة 254 من قانون التجارة اللبناني ربطت مبدأ التذرّع بجميع طرق الإثبات بقرار القاضي الناظر في الدعوى الذي يقرّر ما إذا كانت هذه الطرق مقبولة أو غير مقبولة.

**وإنّي أصرّح، تحت طائلة العقوبة المتعلقة بالتصريح الكاذب وفق قوانين الولايات المتحدة الأميركيّة أنّ مضمون هذا الرأي القانوني يُعبّر عن قناعتي التامة في ضوء القوانين اللبنانية المرعيّة الإجراء.**

**وقّع في بيروت، لبنان، بتاريخ 22 كانون الأوّل 2021**

**القاضي الدكتور غالب غانم**
**الرئيس الأوّل لمحكمة التمييز شرفًا**

29